[Civ. No. 785. Fourth Appellate District.—April 3, 1933.]

EDGAR W. SUMNER, Respondent, v. WILLIAM J. EDMUNDS et al., Appellants.

F. W. Docker and Harris, Willey, Griffith & Harris, for Appellants.

Martin C. Thuesen for Respondent.

CAMPBELL, J., *pro tem.*—Respondent had judgment against appellants Edmunds and Fresno Republican Publishing Company, a corporation, for and on account of personal injuries sustained in an automobile accident which occurred near the city of Fresno on December 17, 1929. The case was tried by the court without a jury, and from a judgment rendered against them said defendants have taken this appeal.

The facts may be summarized as follows: Appellant Edmunds was employed by Fresno Republican Publishing Company, a corporation, to deliver papers; respondent wished to work for the publishing company, and had previously talked with one Carrie, manager of the auto routes for the publishing company, regarding such employment, and Carrie told him that he would be given an opportunity should a vacancy occur. Appellant Edmunds called on respondent the night before the accident and asked him to meet him at the publishing company's office the next morning to accompany him on the route in order to familiarize himself with the route; they met at the appointed hour, and respondent was taken by appellant Edmunds in his automobile and proceeded on the route. Respondent did not negotiate with Edmunds for taking over the route; he did not pay anyone transportation charges, nor did he receive compensation from anyone. Appellant and respondent proceeded along the highway, in a northerly direction, to a point just north of Roeding Park near the city of Fresno. Appellant Edmunds was driving the automobile on the right-hand side of the road, and upon coming to a point where he was to make delivery of a paper to a subscriber, he changed his position to the left-hand side of the highway, and proceeded along the left-hand side of the highway for some distance, when he turned suddenly back to his right, driving his car into a truck proceeding in a southerly direc-

tion on the highway, thereby causing the injuries to respondent.

Appellants contend that the evidence does not sustain certain findings essential to the validity of the judgment rendered against them. The particular findings to which our attention is directed are findings No. 2, " . . . that plaintiff was riding as a guest with the knowledge and consent and at the request of defendants Wm. J. Edmunds and Fresno Republican Publishing Company . . . "; finding No. 3, " . . . that defendant Wm. J. Edmunds drove and operated his said automobile in a careless, reckless and grossly negligent manner . . . "; finding No. 8, " . . . that it is true that as a proximate result of the carelessness, recklessness and gross negligence of said defendants . . . said plaintiff received injuries . . . "; finding No. 15, "That it is not true that on the 17th day of December 1929 plaintiff was an employee of the defendant Wm. J. Edmunds, and that the injury sustained by said plaintiff arose out of his employment . . . "; finding No. 16, "That it is not true that on the 17th day of December 1929 plaintiff was employed by the defendant Fresno Republican Publishing Company . . . "

The court found: "That it is true that said defendant Wm. J. Edmunds was driving his automobile for and on behalf of and at the direction and as an employee and agent of and in the course of his employment with said defendant Fresno Republican Publishing Company."

Appellants concede that the evidence is sufficient to support the finding just quoted.

Since the appellants question the sufficiency of the findings, it becomes necessary to examine the testimony taken at the trial to determine whether there is sufficient support in the evidence for the findings.

On direct examination respondent Sumner testified in part as follows: "Q. How did you happen to be with Mr. Edmunds this morning of the accident? A. Well he came out to my house where I was living the night before the accident, . . . Q. Had you talked to Mr. Edmunds prior to the night before, when he came out to your house? A. No, sir. Q. Had you talked with anyone about anyone coming out to your place that night? A. Well Mr. Carrie told me that he would have . . . Mr. Edmunds come out and drop me a

line or call me up or something. Q. Who is Mr. Carrie, do you know? A. He is the manager of the automobile routes of the Republican. Q. Where did you talk with Mr. Carrie? A. Down at the Republican office. Q. When was that? A. It was about the tenth of December. . . . Q. What was the conversation you had with Mr. Carrie? A. Well I told him that I would like to get an automobile route whenever there was a place open; he said they were, all the men he had were there then, but Mr. Edmunds was thinking about going off on a vacation and that he would need a substitute, and he would get in touch with me whenever he got ready for one. Q. What did Mr. Edmunds tell you the night before, the 17th? A. He told me to meet him down at the Republican office the next morning 2:30 or 2:15. . . . Q. Did you enter into any negotiations with him for taking his job over? A. No, sir. Q. Had you discussed that proposition with him at all? A. No, I don't believe we did. Q. Did you discuss with Mr. Carrie of the Republican as to whether or not you would go to work for the Republican? A. Yes, sir, I believe he told me the first place open he would give me a chance at it. Q. In other words he offered to give you a position in the event one would open up in the future? A. Yes, sir. Q. But there was none open at that time? A. No, sir. Q. Were you receiving any compensation from anyone for going out on the morning of the 17th with Mr. Edmunds? A. No, sir. Q. Were you paying anyone for your transportation? A. No, sir. . . . Q. Do you know where the Apache Indian Village is located? North of Roeding Park? A. Yes, sir. Q. Do you know where the Adams Service Station is located? A. Yes, sir. Q. Approximately how far north of Roeding Park is that? A. Why, I should judge about three quarters of a mile I believe. Q. What time of the morning or afternoon, day or night was it when you arrived out there at the Adams Camp ground? A. It was about 3:45. Q. About 3:45 in the morning? A. In the morning. Q. Which did you come to first, the Apache Indian Village or the Adams Service Station? A. The Indian Village. Q. How far beyond that is the Adams Service Station? A. It was about fifty or sixty feet I think. Q. Where with reference to the Adams Service Station did the collision occur? A. Just north of the Adams Service Station a few feet I should say. Q. On the paved portion of the

highway or not? A. Just about the center of the highway. Q. Tell the court everything that happened from the time just prior to the time you got to the Apache Indian Village? A. Well, he was going about 30 or 35 miles an hour— Q. Who was? A. Mr. Edmunds was. And there was a couple of cars coming toward us, I remember one of them was quite a ways in front of the other, but he waited until he could pass us, or slowed down just a little bit so he could reach the Indian Village after the car passed us, and he turned to his left— Q. How far did he turn to his left? A. He run off, just about the left wheel off, on the oiled part of the road, I suppose, off the highway. Q. Would you say then clear off the paved portion to the westerly side of the State highway? A. Yes, I think his about left wheel was. Q. What is that? A. The left part of his car was off the highway. Q. What did Mr. Sumner—what course did Mr. Sumner—Mr. Sumner, did Mr. Edmunds pursue after that? A. Well he just made about a half circle; he threw off his papers and came back to the highway and just made a sharp turn. . . . Q. Was he on the paved portion when he threw the papers at the service station? A. Yes, just going into it, that is swinging back to the highway then, you know, he turned off a little bit at the Indian Village, turned clear off the highway and was just going back on when he threw the last paper. Q. How far from the point of the collision did you say Mr. Edmunds' car was at the time he left the highway to deliver the paper at the service station? A. Oh, about 200 feet I think. Q. Did you look up the highway, the northerly direction at any time after that? A. I don't just remember whether I did or not. . . . ''

Appellant Edmunds testified in part as follows: ''Q. Well Mr. Sumner was riding with you at the time of the collision wasn't he? A. Yes, sir, he was. Q. Was he paying you anything for that ride? A. No, sir. Q. You knew he was going to ride with you in the automobile when you started out? A. Yes, sir. . . . Q. You say you drove over the center of the highway? A. Yes, sir. Q. Now, will you explain just what you mean by that? A. Well the— Q. With reference to the white center line? A. We were approximately centering the white center line. Q. That is your car was centering it? A. Yes, sir. Q. So that the left hand wheels would be on the left hand side of the center line and

your right hand wheels on your easterly side? A. Yes.
Q. You drove in that position from the time you made the—
or shortly before you made the delivery to the Indian Village
and on up the highway to the point you delivered to the
Adams service station? A. Yes, sir. Q. And then you
swung back to the right? A. Yes, sir. . . . Q. The right
hand front fender of your car struck the right-hand front
fender and wheel of the truck? A. Yes, sir. . . . Q. You
were just pulling back on your right side of the pavement?
A. Yes. Q. You think you were going 35 or 40 miles an
hour? A. About 35 miles an hour. . . . Q. Did you apply
your brakes at any time before the accident? Before the
collision? A. No, sir. Q. Did you ever apply your brakes?
A. No. Q. Never applied them? A. No. Q. What caused
your car to stop? A. Hit a 2½ ton truck. Q. Didn't it
stop when it hit the first one? A. It didn't hit the first
truck a direct blow. Q. It didn't stop at that time? A. No.
Q. Bounced off and hit the second car? A. Yes. Q. And
what caused you to stop? Did you stop your motor? A.
No, I was thrown out of the car. . . . Q. You had four-
wheel brakes? A. Yes, sir. Q. In what distance could you
stop the car at 35 miles an hour? A. From 40 miles an
hour in about fifty feet. Q. In other words if you had seen
this car 50 feet ahead, you could have brought your car to
a complete stop? A. Yes, sir . . . Q. Did you see this truck
prior to the time you collided with it? A. Not more than
one fifth of a second before the collision. . . . Mr. Docker:
Q. Mr. Edmunds, in taking Mr. Sumner with you that
morning, what was your purpose? A. To teach him the
route, the automobile route that I cover. . . . Q. I know, but
I am talking about your lights. How far ahead would they
distinguish objects? A. Approximately one hundred and
fifty feet. . . . Q. How far beyond that could you see ob-
jects at all? Approximately? Just your estimate of it?
A. Not over another—you mean on this special night? Q.
Yes, on that night? A. Not over 40 or 50 feet.''

Does the testimony warrant findings of gross negli-
gence? It is admitted by appellants that the automobile was
being driven in the night-time on the wrong side of the high-
way. Appellant Edmunds says that he had good lights on
his automobile capable of discerning objects 200 feet away,
and says that he did not see the trucks until one-fifth of a

second before the collision. That it is extremely hazardous to propel an automobile in the night-time on the wrong side of the highway without paying particular attention to where one is going, we think, is beyond question. In this case the driving of the automobile on the wrong side of the highway was an intentional act, and there was nothing to prevent the driver of the automobile from seeing the trucks with which he collided had he been using slight care. We are of the conclusion that no automobile can be propelled along the wrong side of a public highway, the driver of which is not keeping a lookout ahead, without an indifference as to the rights and safety of others who may have occasion to use the highway, and driving with greater or less indifference to the safety of a person riding in the automobile so being driven.

In the recent case of *Kastel* v. *Stieber et al.*, 215 Cal. 37, at page 46 [8 Pac. (2d) 474, 477], the court, in discussing gross negligence, says:

" 'That the defendants were violating a statute of the state stands admitted; therefore the language of the Supreme Court in *Benjamin* v. *Noonan*, 207 Cal. 279 [277 Pac. 1045, 1046], is pertinent, to-wit: ''While it is undoubtedly correct to say that the act of driving a vehicle over a street or public highway beyond the speed limit established by a municipal ordinance or a statute merely constitutes evidence of negligence in cases where damages has followed the infraction of such an ordinance or law, the rule in this state is, however, that it is conclusive evidence of negligence. (Citing cases.) Therefore the statement that such an act is 'of itself negligence' or 'negligence as a matter of law' or 'negligence *per se*' (equivalent expressions) is, in this state strictly correct.'' (Citing a number of authorities.)

" 'In 45 C. J., page 678, the rule is thus stated: ''Violation of a statute or ordinance does not of itself constitute wilfulness or wantonness, but it may be considered as a circumstance tending to show that the act or omission in question was wilful or wanton, as being entirely regardless of the law and the safety of others.'' In this state gross negligence does not involve the elements of either wilfulness or wantonness. If the intent to do the act constituting negligence is present, it is not necessary that it be wilful or wanton in

order to conclude that the circumstances surrounding the performance of the act establish gross negligence.

" 'In the recent case of *Malone et al.* v. *Clemow et al.*, 111 Cal. App. 13 [295 Pac. 70, 71], we find the meaning of the words "gross negligence" considered. It is there said: "Gross negligence has been defined to be the want of slight diligence." (*Redington* v. *Pacific Postal Telegraph Cable Co.*, 107 Cal. 317 [48 Am. St. Rep. 132, 40 Pac. 432, 434]; *Walther* v. *Southern Pac. Co.*, 159 Cal. 775 [37 L. R. A. (N. S.) 235, 116 Pac. 51]; Shearman & Redfield on Negligence, sec. 49; *Krause* v. *Rarity et al.*, 210 Cal. 644 [77 A. L. R. 1327, 293 Pac. 62, 66]; *Coit* v. *Western Union Tel. Co.*, 130 Cal. 657 [80 Am. St. Rep. 153, 53 L. R. A. 678, 63 Pac. 83]; *Helme* v. *Great Western Milling Co.*, 43 Cal. App. 416 [185 Pac. 510, 512]; 19 Cal. Jur. 554.) In the recent case of *Krause* v. *Rarity, supra*, the Supreme Court in considering the meaning of the phrase "gross negligence" as used in section 141¾ of the California Vehicle Act said: "In many jurisdictions the division of negligence into degrees is not countenanced (20 R. C. L. 21), the concept being that such phrases as 'gross negligence' and 'slight negligence' are misnomers. In this state the degrees of negligence have been frequently recognized. The term 'gross negligence' has been defined as 'the want of slight diligence', as 'an entire failure to exercise care, or the exercise of so slight a degree of care as to justify the belief that there was an indifference to the things and welfare of others', and as 'that want of care which would raise a presumption of the conscious indifference to consequences'." We should not confuse "gross negligence" with "wilful misconduct", because there is a clear distinction between the two terms.' "

The next question presented by this appeal is whether the evidence in this case is sufficient to support the finding that respondent was not an employee of the appellant Edmunds, or appellant Fresno Republican Publishing Company. The testimony shows that he had merely offered his services which had not yet been accepted, either by appellant Edmunds or by appellant Fresno Republican Publishing Company; that he had been invited by them to go with appellant Edmunds to learn the route so that he might take it in case a vacancy occurred at some time in the future. There is no evidence showing that respondent's offer of his

services was accepted. There is evidence showing that it was not accepted. A mere offer of services not yet accepted by the prospective employer is not sufficient to make the offeree an employee. (*California Highway etc.* v. *Industrial Acc. Com.*, 40 Cal. App. 465 [181 Pac. 112].)

Appellants argue at length in their attack on finding number two that respondent was not a guest of appellants, and rely upon the case of *Crawford* v. *Foster*, 110 Cal. App. 81 [293 Pac. 841, 842]. Section 141¾ of the California Vehicle Act defines a guest as follows: "For the purpose of this section the term guest is hereby defined as being a person who accepts a ride in any vehicle without giving compensation therefor." In considering this section, the court in the Crawford case, *supra,* says: "We think the meaning of the language used is, that a guest is one who is invited, either directly or by implication, to enjoy the hospitality of a driver of a car; who accepts such hospitality; and who takes a ride either for his own pleasure or on his own business, without making any return to or conferring any benefit upon the driver of the car, other than the mere pleasure of his company."

In the Crawford case, *supra,* the plaintiff was injured while riding in an automobile which was being demonstrated to the plaintiff by defendant Martins, who was the agent of defendant Foster. Defendant Foster was in the business of selling automobiles and defendant Martins was one of his salesmen. The court says in that case, at page 85:

"The relationship between the parties here is not entirely dissimilar to that existing between the owner of a store and a customer using an elevator therein. In such a case, the Supreme Court has said: 'Naturally this facility of transportation would increase its patronage and necessarily its profits in business. In fixing the price at which its goods and merchandise must be sold so as to return a profit, necessarily the operating expenses of the establishment, including this elevator service, must be taken into consideration and provided for. The prices charged and paid by customers for goods would include a reimbursement to appellant for its expenses entailed in the operation of the elevator for its patrons, and hence would constitute a sufficient reward for their carriage so as to bring appellant within the category of a carrier of passengers for hire and subject to the same

duties and responsibilities.' (*Champagne* v. *Hamburger,* 169 Cal. 683 [147 Pac. 954, 958].)

"The indirect benefit to the merchant is in that case held to be compensation for a ride in an elevator. A similar benefit appears in the instant case, which we think must be held to be a compensation, given and received, for the ride in question. While the respondents may not have been passengers for hire, having given compensation for the ride, they were not guests. . . .

"In Massachusetts, although they have no statute similar to the one here in question, the rule has been established that where an invited guest is riding in a machine with the owner thereof, he cannot recover for injuries sustained, unless the owner and driver of the car was guilty of gross negligence. (*Massaletti* v. *Fitzroy,* 228 Mass. 487 [Ann. Cas. 1918B, 1068, L. R. A. 1918C, 264, 118 N. E. 168]; *West* v. *Poor,* 196 Mass. 183 [124 Am. St. Rep. 541, 11 L. R. A. (N. S.) 936, 8 N. E. 960].) But in applying the rule, the courts of that state have distinguished between cases where one is a mere guest of another and has been permitted to ride gratuitously, and cases where one, in riding, is conferring some benefit upon the driver of the car. (*Lyttle* v. *Monte,* 248 Mass. 340 [142 N. E. 795]; *Jackson* v. *Queen,* 257 Mass. 515 [154 N. E. 78]; *Labatte* v. *Lavallee,* 258 Mass. 527 [155 N. E. 433]; *Loftus* v. *Pelletier,* 223 Mass. 63 [111 N. E. 712].) Not only is such a distinction a logical one, but that it was intended by the statute here in question is indicated by the use of such broad words as 'giving compensation', instead of words limiting the meaning to the payment of a fare, or the transfer of a definite consideration.''

In the case at bar we have found that respondent was not an employee of appellants. The evidence shows that he was traveling with appellant Edmunds at the instance and request of the appellants for the purpose of learning the paper route, so that in the future, should the occasion arise, he might be able to take the route over from Edmunds. The case just cited, *Crawford* v. *Foster,* relied upon so strongly by appellants, can afford appellants very little comfort, for if respondent was not a guest he was a passenger within the rule laid down in that case; and it is our opinion respondent comes within that rule. In that event ordinary

negligence is all that would have to be proved in order to recover.

We have examined the record carefully, and have quoted quite extensively from it, and in view of all the evidence we are not inclined to disturb the findings of the lower court. ▮ All the findings attacked are supported by ample evidence, and appellants cannot complain of findings of proof of gross negligence where proof of ordinary negligence would have been sufficient. Under these circumstances it is not necessary for this court to prepare new findings under section 956a of the Code of Civil Procedure.

The judgment is affirmed.

Barnard, P. J., and Jennings, J., concurred.