[L. A. No. 28984.   In Bank.   Dec. 15, 1966.]

REYNOLDS ELECTRICAL & ENGINEERING COMPANY, INC., Petitioner, v. WORKMEN'S COMPENSATION APPEALS BOARD and JAMES F. EGAN, Respondents.

Herlihy & Herlihy, E. H. Herlihy and Henry E. Phister for Petitioner.

Everett Corten, Edward A. Sarkisian, Victor E. Kaplan and William B. Murrish for Respondents.

MOSK, J.—James Egan, a California resident, suffered an industrial injury at Mercury, Nevada, while employed as a structural ironworker by Reynolds Electrical & Engineering Company, Inc., hereinafter called Reynolds.[1] The Industrial Accident Commission (the commission)[2] awarded Egan workmen's compensation benefits for his injury. Reynolds seeks to annul the award, contending that the commission had no jurisdiction over Egan's claim. The primary question presented is whether the commission correctly found that the contract of employment between Egan and Reynolds was executed in California. We conclude that the commission's determination must be upheld.

Section 5305 of the Labor Code provides that the commission has jurisdiction over all controversies arising out of injuries suffered outside the state if the injured employee is a California resident at the time of the injury and the contract of hire was made here. Section 3600.5 states that California workmen's compensation laws apply to an employee who has been hired in this state and is injured in the course of his employment outside California.

Egan was a resident of Santa Maria, California, at the time he was injured, and a member of Los Angeles Local 433 of the International Association of Bridge, Structural & Ornamental Iron Workers. Reynolds had entered into a collective bargaining agreement with the union providing that the union was to maintain a hiring hall and that Reynolds was to employ ironworkers through sources other than the hiring hall only if the union was unable to fill requests for workers within 48 hours. The agreement also stated that workmen registered with the union were to be placed in certain groups, depending upon their experience and work specialty and that their names were to appear on the hiring hall list chronologically in order of the date of their registration. The agreement required the employer to request personnel by classification and specialty and the union to refer workers on that basis in the sequence of registration. A worker who refused dispatch to an appropriate job or failed to appear at the jobsite after dispatch was penalized by being removed from the registration list. If a job was located more than 35 miles from Los Angeles, a workman was

---

[1]Reynolds is a corporation organized and existing under the laws of Texas. It had qualified to do business in California and had designated C. T. Corporation System as its California agent upon which service of process could be made.

[2]Now the Workmen's Compensation Appeals Board.

to be paid at his usual rate for the time he spent traveling to the jobsite in addition to compensation for transportation expenses at nine cents a mile and subsistence of seven dollars a day.[3]

Some time prior to the events involved herein, Reynolds had contacted the union in Los Angeles and requested a number of ironworkers for a job at Mercury, Nevada. Thereafter, Egan called the business agent of the union, inquiring about employment, and was informed there was an opening with Reynolds in Nevada. On December 15, 1961, he was dispatched to the job by the union. Pursuant to the collective bargaining agreement, the union gave to him for transmittal to the employer's representative at the jobsite a referral slip containing his name, address, the type of work he was to perform, and other pertinent personnel information.

On December 16, a Saturday, Egan arrived at the Reynolds office in Las Vegas, gave the personnel manager his referral slip, and was instructed to fill out several forms. One was a questionnaire which all employees at the Mercury site were required to complete for the purpose of obtaining security clearance from the Atomic Energy Commission. It contained detailed questions about the employee's personal history, including past employment, his places of residence, the names of dependents, and similar personnel data. He also filled out other papers, including a W-2 form for tax withholding purposes, a document relating to the searching of vehicles, and one concerning the release of information observed at the jobsite. He spent more than six hours filling out these numerous forms. When he had completed this task, he was instructed to report for work on Monday at Mercury.

Subsequently, he received a check for $116.32 from Reynolds. This represented subsistence pay for December 15 and 16, nine cents a mile for the distance from Los Angeles to Mercury, and $4.50 an hour, his regular rate of pay, for travel time from his home to Mercury, including two hours' pay for the trip from Las Vegas to Mercury. At the hearing before the commission, in reply to a question from Reynolds' counsel as to whether the forms he had filled out on December 16 were

[3]The effective date of the agreement is August 16, 1962, and Egan's injury occurred before this date, on January 23, 1962. The referee noted this discrepancy and assumed that the agreement in effect at the time of the injury was identical with the one introduced in evidence since the parties deemed it binding. The same position appears to be taken by the parties in the present phase of the proceeding.

applications for employment, Egan testified that he had been hired for the job previously because he was then on the payroll. He was injured at Mercury on January 23, 1962.

The commission concluded that the contract of hire was made in California, reasoning that the contingencies which would have precluded a worker from assuming his duties or from retaining employment were conditions subsequent to employment rather than conditions precedent. That Egan was required to obtain security approval did not affect this conclusion since the clearance was to be certified by an agency of the United States Government rather than by Reynolds and, in addition, the evidence indicated Egan commenced work before clearance was obtained. The commission stated further that although the question at issue was of first impression in California, the courts of North Carolina, New Jersey, and Oklahoma held under comparable circumstances that the contract of hire was made in the state from which the worker was dispatched by the union. (*Warren* v. *Dixon & Christopher Co.* (1960) 252 N.C. 534 [114 S.E.2d 250]; *Gomez* v. *Federal Stevedoring Co.* (1949) 5 N.J. Super. 100 [68 A.2d 482]; *Bowers* v. *American Bridge Co.* (1956) 43 N.J. Super. 48 [127 A.2d 580]; *Foster Wheeler Corp.* v. *Bennett* (Okla. 1960) 354 P.2d 764.)

■ A contract of employment is governed by the same rules applicable to other types of contracts, including the requirements of offer and acceptance. ■ An employee who is hired pursuant to a collective bargaining agreement between a labor union and an employer is deemed to be a third party beneficiary, with a relationship to the employer the same as if the contract had been made directly with him. (*Sublett* v. *Henry's etc. Lunch* (1942) 21 Cal.2d 273, 275 [131 P.2d 369]; *Chicago Bridge etc. Co.* v. *Industrial Acc. Com.* (1964) 226 Cal.App.2d 309, 318 [38 Cal.Rptr. 57]; 1 Williston, Contracts (3d ed. 1957) § 39A, pp. 124-125.)

■ In determining the issues before us we are bound by the familiar rules that conflicts in the evidence must be resolved in favor of the respondent commission and that the findings will not be disturbed on appeal if there is any evidence in their support. (*Rogers Materials Co.* v. *Industrial Acc. Com.* (1965) 63 Cal.2d 717 [48 Cal.Rptr. 129, 408 P.2d 737].) Also of significance is the command of section 3202 of the Labor Code that the workmen's compensation laws are to be liberally construed in order to extend their benefits to injured employees. In the instant case the commission was justi-

fied in concluding that the contract of hire between Egan and Reynolds was made in California, on the theory that the union was the agent of Reynolds for the purpose of transmitting offers of employment to its members and that Egan accepted Reynolds' offer when he received his dispatch referral slip and departed for the jobsite.

The commission's conclusion is fortified by the fact that Egan was paid regular wages for the time expended in traveling to the jobsite in Nevada. In *Kobe* v. *Industrial Acc. Com.* (1950) 35 Cal.2d 33 [215 P.2d 736], this court held that an agreement that the employment relation should continue while an employee was going to and coming from work could be inferred from the fact that the employee was compensated for the time thus consumed.[4]

The evidence is also sufficient to support the commission's determination that the requirement for Egan to obtain Atomic Energy Commission security clearance did not prevent the formation of an employment contract prior to his arrival in Nevada. In *Chicago Bridge etc. Co.* v. *Industrial Acc. Com., supra,* 226 Cal.App.2d 309, an employee who was a member of a California labor union was injured while working on a job in Nevada.[5] There, as in the present case, the employee was required to obtain security clearance. The court found no indication that the contract of employment should become effective only after the clearance was obtained, and held the perform-

---

[4]Reynolds claims that under the contract Egan would not have been paid either wages during the time he traveled to the jobsite or subsistence unless he was "hired." However, the agreement clearly spells out the circumstances under which an employee may be deprived of travel expenses and wages during the period of travel, and rejection of the employee when he arrives at the jobsite is not specified as a ground for the nonpayment of those benefits. Section 11G of the agreement provides that "Any workman who voluntarily quits before he has worked ten (10) days or who is discharged with just and sufficient cause prior to completion of the job will not be entitled to return mileage or travel allowance. On jobs of five (5) or more days duration travel compensation and mileage will not be paid either way if a workman voluntarily quits before he has worked five (5) days or shifts." If we were to accept Reynolds' position we would be required to hold, in the face of these specific provisions, that the contract contemplates that an employer may request the services of a workman at a distant jobsite, that the worker must accept the dispatch or be penalized, and that when he arrives at the place where he is to work, the employer may reject him without cause and refuse to compensate him for any of the expenses of his travel. Reynolds points to no provision of the contract which would permit such arbitrary conduct.

[5]In the *Chicago Bridge* case the court held that the contract of hire was made in California because the employer's representative as well as the employee were in California at the time the hiring arrangements were made.

ance of incidental administrative matters after the employee arrived at the job, including filling out employment forms, was consistent with the performance of a contract already in existence. Here, as we have seen, the commission found that Egan had not received security clearance before actually commencing work. Under these circumstances, there was ample justification for the determination that obtaining such clearance was a condition subsequent to employment.

Reynolds insists that the union was not authorized to act as its agent. ██ There can be no doubt that under the provisions of the collective bargaining agreement the union was to act as the employer's agent for some purposes. The question at issue here concerns the scope of its agency, i.e., whether it was merely empowered to transmit information about available jobs to its members or whether it was authorized to transmit offers of employment on behalf of employers. In view of the provisions of the contract that the employer was required to give preference to men sent by the union, that when a request for workmen was received the union was to send workers in a stated order depending upon experience and work specialty, that a worker who refused dispatch for a suitable job would be penalized, and that he received wages from the time of dis-patch to a job in another area, we must uphold the commission's implied determination that the union was the agent of Reynolds for the purpose of transmitting an offer of employment to Egan and that Egan accepted the offer when he obtained his dispatch slip and departed for the jobsite. This conclusion is consistent with the provisions of the contract and with the authorities cited above.

This construction of the contract violates no provision of section 158(a)(2) of the Labor Management Relations Act of 1947, commonly known as the Taft-Hartley Act. (29 U.S.C. § 141 et seq.) The section provides *inter alia* that it is an unfair labor practice for an employer to dominate or interfere with the function or administration of any labor organization. No authority has been cited for the proposition that designation of the union as the employer's agent for the purpose of transmitting offers of employment would constitute such proscribed interference. To the contrary, several decisions have recognized that a union may perform such acts on the employer's behalf, provided it does not engage in discriminatory practices. (See, e.g., *National Labor Relations Board* v. *H. K. Ferguson Co.* (5th Cir. 1964) 337 F.2d 205, 208; *National*

*Labor Relations Board* v. *Southern Stevedoring & Contracting Co.* (5th Cir. 1964) 332 F.2d 1017, 1019; *Morrison-Knudsen Co.* v. *National Labor Relations Board* (2d Cir. 1960) 275 F.2d 914, 917.)

Another contention advanced by Reynolds is that no contract of hire was consummated in this state because, under the collective bargaining agreement, the employer may reject a worker when he reports to the jobsite in Nevada. Although the agreement does provide that an employer may reject a worker referred by the union, if this occurs the employer must pay subsistence to a worker sent from another area and two hours' "show-up time" at the applicable straight time or overtime rate. However, if the worker appears for the job "in an unfit condition or without proper tools or qualifications" the employer need not pay "show-up time."[6] These provisions require payment of a stated wage to any worker referred by the union, unless he is rejected by the employer for cause. The commission was, therefore, justified in concluding that the possibility an employer will reject the worker for cause when he arrives at the jobsite does not prevent a contract of hire from coming into existence at the time of the worker's departure for the job.[7]

---

[6]Section 4D of the agreement states, "The individual employer shall have the right to reject any applicant referred by the appropriate Local Union, subject to the provisions of Section 5B and Section 11J—'Show Up Time.'"

Section 5 is entitled "Work Hours Per Day" and paragraph B thereof states in part: "Work Day. When a workman is ordered by the individual employer or his representative to report for work and then through no fault of the workman is not put to work, the individual employer shall pay him for two hours' time, weather permitting work, provided the workman remains on the job the said two hours. On Saturdays, Sundays and holidays, show up time will be computed at the applicable overtime rate."

Section 11 refers to "Expenses Out of Town" and subdivision J provides: "Show-Up Time—On jobs located outside the free zones workmen who report for work and for whom no work is provided, shall be paid two (2) hours' pay at the applicable straight time rate in addition to subsistence. On Saturdays, Sundays and holidays, show-up pay will be computed at the applicable overtime rate; provided that, to qualify for show-up pay on any day the workman must remain at the jobsite available for work, unless released by the individual employer or his representative. NOTE: The intent of both parties is that show-up time shall not be paid when the workman appears for work in an unfit condition or without proper tools or qualifications."

[7]Reynolds also relies on a clause of the agreement stating, "The individual employer shall be the sole judge of the qualifications of all of his employees, and may discharge any of them." This provision appears to refer to a situation in which an employee has commenced working on a job and is thereafter determined by the employer to be unqualified. In

There are cases holding that the mere fact an employer pays a workman for the cost of travel to a job does not necessarily indicate that he was hired at the start of his journey. (E.g., *California Highway Com.* v. *Industrial Acc. Com.* (1919) 40 Cal.App. 465 [181 P. 112]; *Beach* v. *Department of Water & Power* (1940) 6 Cal.Comp. Cases 2.) These cases are variously distinguishable, including their concern only with transportation costs, whereas here Egan was paid not merely the cost of his transportation, but also his regular wages en route.

■ Before Egan filed an application for compensation benefits with the California Industrial Accident Commission, the Nevada Industrial Commission held an informal hearing and tendered Egan an award, which he refused to accept. Reynolds maintains that the Nevada award is res judicata and that the full faith and credit clause of the United States Constitution (art. IV, § 1) precludes California from making an award for the identical injury. Reynolds relies on *Magnolia Petroleum Co.* v. *Hunt* (1943) 320 U.S. 430 [88 L.Ed. 149, 64 S.Ct. 208, 150 A.L.R. 413], in which it was held that an award of workmen's compensation benefits made by Texas was res judicata in a subsequent proceeding in Louisiana instituted by the same party to recover benefits for the same injuries, and that the full faith and credit clause barred the Louisiana award. However, *Magnolia* was based on Texas statutes providing that a Texas award was in lieu of any other recovery for injury to the employee, thus precluding recovery under the laws of another state. Four years after *Magnolia, Industrial Com.* v. *McCartin* (1947) 330 U.S. 622 [91 L.Ed. 1140, 67 S.Ct. 886, 169 A.L.R. 1179], determined that the full faith and credit clause did not bar a proceeding to recover workmen's compensation benefits in Wisconsin although there had been a prior award of compensation in Illinois arising out of the same injury. The court held that there must be "unmistakable language" in the decisions or statutes of the state which first granted compensation to the effect that its laws were designed to preclude recovery in another state. Since there is no Nevada statute to this effect, the Nevada award is not a bar to the commission's award of benefits here.

Finally, Reynolds urges that it would be contrary to public policy to hold that the California workmen's compensation

any event, it does not vitiate the requirement of sections 5B and 11J that a worker who reports for a job be paid "show-up time" and subsistence pay unless he is rejected for cause.

438

law applies in the instant circumstances because such a conclusion would suggest an employer needs workmen's compensation insurance in every state from which it obtains employees, subjecting it to a purportedly staggering amount of premiums. A similar plaintive plea may be made by every employer who hires persons in California for work outside the state. ■ The judicial function does not encompass evaluating the wisdom of provisions of the Labor Code making California compensation laws applicable to contracts of hire consummated in this state. This is a problem which, if significant, should more appropriately be addressed to the Legislature.

The award is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Peek, J., and Burke, J., concurred.

Petitioner's application for a rehearing was denied January 10, 1967.