[L.A. No. 29942. In Bank. Mar. 6, 1972.]

JOHN L. LAENG, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD,
CITY OF COVINA et al., Respondents.

## COUNSEL

Donine, Donine & Cuthbert and Marvin D. Donine for Petitioner.

Rupert A. Pedrin, Stanley S. Feinstein, T. Groezinger, James J. Vonk and W. R. Lowndes for Respondents.

John D. Maharg, County Counsel, Mary Carol Scherb, Deputy County Counsel, and Milton J. Litvin as Amici Curiae on behalf of Respondents.

## Opinion

**TOBRINER, J.**—While participating in the "obstacle course" phase of a physical agility test conducted by the City of Covina as part of a "tryout" competition for the position of "refuse crew worker," petitioner John Laeng fell from a raised, horizontal telephone pole and severely fractured his right foot. Laeng sought compensation for his injuries under the Workmen's Compensation Act, but the referee, although sympathetic to the "equities" of Laeng's claim, concluded that the claimant was precluded from a workmen's compensation recovery since, at the time of the injury, he had not yet become an "employee" of the respondent city. After granting a petition for reconsideration of the referee's decision, the Workmen's Compensation Appeals Board (WCAB), by a 2-1 vote, denied the claimant all compensation benefits; Laeng attacks the decision of the WCAB by the present petition.

For the reasons discussed more fully below, we have concluded that the claimant's challenge to the board's action must be sustained. ■ Although at the time of his injury Laeng was concededly not an "employee" of the city in a strict, contractual sense of that term, we are not constrained in interpreting the provisions of the Workmen's Compensation Act by the common law contractual doctrine but must instead be guided by the purposes of the legislation at issue. ■ ■ Workmen's compensation, of course, fundamentally proposes to protect individuals from any "special risks" of employment; thus when an employer, as part of a "tryout" for an employment position, exposes an applicant under his control and direction to such risks, any resulting injury becomes properly compensable under the workmen's compensation law. ■ In the instant case, the claimant suffered injury as, pursuant to the city's instructions, he quickly scrambled through the potentially dangerous "obstacle course," a course designed by the employer to correlate with the actual conditions of employment. Under these circumstances, we believe that Laeng's injury was compensable under the Workmen's Compensation Act as a matter of law and that the board erred in holding to the contrary.

We begin our analysis with a review of the uncontested facts from which the present controversy arose. In response to a newspaper advertisement placed by respondent City of Covina, petitioner Laeng applied for a city position as a "refuse crew worker" on April 20, 1970; thereupon the city directed him to take a written examination on April 25th at a local high school. After completing the examination along with 45 other applicants, Laeng received notice on April 29th that he had passed the written test and that he should report to the high school on May 2d for a physical agility test.

Pursuant to these instructions, Laeng, with 13 other applicants who had also successfully completed the written examination,[1] reported to the high school gymnasium. The "agility test" scheduled for that day consisted of four separate activities—sit-ups, broad jump, chin-ups and a timed obstacle course—and was supervised by two city employees, apparently physical education instructors. The applicants were scored on their performances of each individual activity, and only those who had received satisfactory grades on the sit-up, broad jump and chin-up phases were permitted to undertake the final activity, the obstacle course. Laeng successfully completed the first three parts of the test and then was directed to participate in the final "obstacle course" phase.[2]

The course constructed by the city presented a series of obstacles, commencing with a horizontally laid telephone pole, raised approximately three feet off the ground, along which the participants in the test were to run. Other obstacles encountered in the test included a "wall," a series of bars, and several other raised logs, which the applicants were variously to climb onto, jump off of and crawl under. The "obstacle course" phase was a timed event—each participant was given only 90 seconds to complete the course—and this factor naturally required the applicants to attempt to surmount the successive obstacles as quickly as possible. At the hearing before the workmen's compensation referee, the city personnel director, who supervised the administration of the test, testified that only potential policemen, firemen and refuse men were required to take any physical agility test at all, and that the particular test that the claimant had taken was correlated to the type of work—"the constant jumping . . . on and off the truck, up and down, all day"—involved in the "refuse crew" job for which he was applying.

Laeng commenced the obstacle course at the direction of the supervising personnel, but as he ran across the raised telephone pole, he slipped, fell

---

[1]The city's personnel director testified that the city pursued the policy of permitting only those applicants who had passed the written examination to take the physical agility test. Applicants who successfully completed the physical agility test were required to take both an oral examination and a medical examination before finally qualifying for city employment.

[2]Before permitting Laeng to take the physical agility test, the city required him, and all other applicants, to sign a "waiver" form containing the following statement: "In consideration of my being permitted to take the physical examination, I agree that I shall not hold the City of Covina, or any of its officers, responsible for any injury or damage I may receive or cause to myself during or as a result of the examination." At the workmen's compensation hearing, the referee refused to admit this waiver into evidence, concluding that it was "against public policy." Respondents have not challenged this characterization of the waiver form in this court, and insofar as Laeng's injuries would otherwise be compensable under workmen's compensation, this purported waiver directly conflicts with Labor Code section 5000 and must fail.

to the ground, and severely fractured his right foot. The injury caused substantial pain, and Laeng could not walk at all; his wife was called to the school and several of the persons present carried him to his car. Laeng immediately went to his family doctor who, after X-raying the foot referred the patient to an orthopedic surgeon. The claimant thereafter underwent surgery, remained hospitalized for six days and was unable to return to work through September 29, 1970, the date of the initial workmen's compensation hearing.[3] At the hearing, Laeng presented bills evidencing medical expenses of more than $800 as a result of the injury, as well as a bill of $70 for "medical-legal" costs, incurred in obtaining a physician's "examination report" as required by the WCAB's rules of practice and procedure.

Upon hearing the foregoing uncontested facts, the referee observed that "[a]lthough the equities appear to be in favor of applicant, [the] law appears to preclude a finding of employment,"[4] and, accordingly, he found that the claimant was not an employee of the City of Covina at the time of the injury and that his injury was noncompensable under workmen's compensation; the referee also determined, however, that the $70 medical-legal expenses were reasonably incurred and he awarded that sum to the claimant. Upon the petition of both the applicant and the city, the Workmen's Compensation Appeals Board granted reconsideration of the matter, and after reconsideration, issued an opinion, by a 2-1 vote, denying the claimant both compensation for the injury and the medical-legal costs that had been awarded by the referee. In this present petition for review, the claimant primarily challenges the board's conclusion that the injury, incurred during his "tryout" for the "refuse crew worker" position, is not compensable under the workmen's compensation laws because he was not an "employee" of the city at that time.

■    Although we recognize that at the time of his injury the claimant was not yet "employed" by the city in any contractual sense, we are not confined, in determining whether Laeng may be considered an "employee" for purposes of workmen's compensation law, to finding whether or not the city and Laeng had entered into a traditional contract of hire. On the contrary, Labor Code section 3351 provides broadly that for the purpose of the Workmen's Compensation Act " 'Employee' means every person in

---

[3]Laeng's treating physician recommended that the claimant not return to his prior work as a salesman earlier than November 1, 1970.

[4]In assessing the "equities" of the situation, the referee stated: "Workmen's compensation law is primarily concerned with the question of when the risks of employment begin, rather than when services or benefits commence to flow to either party. Clearly in instances such as this, risks are initiated with the test. The question now becomes 'Can "employment" encompass all phases of pre-employment testing in instances where a probability of employment exists but no definite tender of employment has been made?' "

the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written . . . ."[5] Section 3357 of the Labor Code declares that *"Any person rendering service for another, other than as an independent contractor, or unless expressly excluded herein, is presumed to be an employee."*[6] (Italics added.) (See also Lab. Code, § 5705, subd. (a)).

Given these broad statutory contours, we believe that an "employment" relationship sufficient to bring the act into play cannot be determined simply from technical contractual or common law conceptions of employment but must instead be resolved by reference to the history and fundamental purposes underlying the Workmen's Compensation Act (cf. *Board v. Hearst Publications, Inc.* (1944) 322 U.S. 111, 124-129 [88 L.Ed. 1170, 1181-1183, 64 S.Ct. 851]; *B. P. Schulberg Prod.* v. *Cal. Emp. Com.* (1944) 66 Cal.App.2d 831, 834-835 [153 P.2d 404]. See generally, 1a Larson, Workmen's Compensation Law (1967) §§ 43.41, 43.42, pp. 628-633; 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. 1970) § 3.01[2], pp. 3-3 to 3-5).[7] ■ In so doing we must bear

[5]Contrary to the respondents' suggestion, California workmen's compensation law does not require that an applicant be receiving actual "compensation" for his "services" in order to fall within the workmen's compensation scheme. As set out above, Labor Code section 3351 defines "employee" for purposes of the act as "every person in the service of an employer under any appointment *or* contract of hire *or* apprenticeship, express or implied, oral or written . . ." (italics added); the section's explicit use of the disjunctive refutes respondents' contention that a "contract of hire" is itself a prerequisite to recovery. (See, e.g., *County of Monterey* v. *Industrial Acc. Com.* (1926) 199 Cal. 221, 224-225 [248 P. 912, 47 A.L.R. 359]; *Bennewitz* v. *Buchanan Olds, Inc.* (1943) 8 Cal. Comp. Cases 190; *Oldknow* v. *Western Union Telegraph Co.* (1943) 8 Cal. Comp. Cases 20, 21; *Gwartney* v. *Western Aviation Co.* (1920) 7 I.A.C. 5; *Noyes* v. *City of Eureka* (1918) 5 I.A.C. 163; cf. *Claremont Country Club* v. *Industrial Acc. Com.* (1917) 174 Cal. 395 [163 P. 209]; *Anaheim General Hospital* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.App.3d 468, 473 [83 Cal.Rptr. 495]; *Union Lumber Co.* v. *Industrial Acc. Com.* (1936) 12 Cal.App. 2d 588, 595-596 [55 Cal.Rptr. 911].) The present case, of course, is not one in which the applicant can be said to have "gratuitously" volunteered his services to the city, as was true of the volunteer canteen hostess in *Edwards* v. *Hollywood Canteen* (1946) 27 Cal.2d 802 [167 P.2d 729], who was injured while dancing with a boisterous soldier.

[6]Labor Code section 3352 explicitly excludes certain positions from this broad, statutory definition of "employee" but none of the specific exclusions are relevant to the instant case. Unless otherwise indicated, all subsequent section references are to the Labor Code.

[7]By this statement, of course, we do not imply that common law notions of the employment relationship should never be considered in determining the issue of "employment" under workmen's compensation, but only that such common law principles are not determinative of the issue. As both Larson and Hanna have pointed out, the differences between the common law and workmen's compensation usage of the term "employment" stem from the fundamentally different purposes served by the employment concept in each context. Thus, whereas at common law the

in mind section 3202's mandate that "workmen's compensation statutes are to be construed liberally in favor of awarding compensation." (*Greydanus* v. *Industrial Acc. Com.* (1965) 63 Cal.2d 490, 493 [47 Cal.Rptr. 384, 407 P.2d 296]; *Reynolds Elec. etc. Co.* v. *Workmen's Comp. App. Bd.* (1966) 65 Cal.2d 429, 433 [55 Cal.Rptr. 248, 421 P.2d 96].)

As both parties recognize, no prior reported appellate decision in California has addressed the precise question of whether an injury sustained during a "tryout" for an employment position is compensible under our workmen's compensation legislation; indeed, our research discloses that the question has only rarely been litigated in our sister states as well. In the leading American case on this issue, *Smith* v. *Venezian Lamp Co.* (1957) 5 App.Div.2d 12 [168 N.Y.S.2d 764], a New York court did directly address the problem of a "tryout" injury, and squarely held that a claimant sustaining such an injury could recover workmen's compensation benefits.

In the *Venezian Lamp* case the claimant had applied for a job as a lamp polisher with the defendant lamp company and the company's supervisor agreed to try the applicant out; as in the instant case, the applicant was to receive no monetary compensation for the "tryout." The applicant was given a lamp to polish, and the use of a buffing machine, but during the tryout the lamp fell from the machine and injured him. In concluding that the claimant could recover under workmen's compensation, the court declared: "[I]t is . . . our view that where a tryout involves an operation that would be ordinarily viewed as hazardous . . . a special employment exists. . . . A tryout is for the benefit of the employer, as well as the applicant, and if it involves a hazardous job we see no valid reason why the applicant should not be entitled to the protection of the statute." (5 App. Div.2d at pp. 13-14 [168 N.Y.S.2d at p. 766.])

The *Venezian Lamp* decision was subsequently not only held controlling in the case of *Bode* v. *O. & W. Restaurant* (1959) 9 App.Div.2d 969 [193

---

"master-servant" concept was utilized primarily to delimit the scope of the master's vicarious tort liability and was thus concerned with injuries caused *by* the employee, the basic inquiry in compensation law involves which injuries *to* the employee should be insured against by the employer. (1a Larson, Workmen's Compensation Law (1967) § 43.42, pp. 632-633; 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. 1970) § 3.01[2], p. 3-4.) Although there is considerable overlap between the two fields, in each context the determination of the presence or absence of a sufficient "employment" relationship must ultimately depend on the purpose for which the inquiry is made. Earlier cases, such as *Western Ind. Co.* v. *Pillsbury* (1916) 172 Cal. 807, 813-814 [159 P. 721] and *County of Los Angeles* v. *Industrial Acc. Com. (Calderwood)* (1932) 123 Cal.App. 12, 17 [11 P.2d 434], while concededly reflecting a less receptive attitude to the "purposive" approach to statutory interpretation than that shared by most courts today, stopped short of freezing the "employment" concept into an unchanging mold, insensitive to the context in which the term is used, as the respondents apparently would have this court do.

N.Y.S.2d 845] when a "tryout" pantry chef fell down a flight of stairs on the employer's premises, but has also been cited with approval by other state courts. (See, e.g., *Lotspeich* v. *Chance Vought Aircraft* (Tex. 1963) 369 S.W.2d 705, 709 (injury sustained at pre-employment medical examination compensable under workmen's compensation).)

■ Although as we have noted above, no prior reported California judicial decision has adjudicated the issue of "tryout" injuries,[8] the majority of California compensation board decisions which have addressed the matter have reached the same conclusion as the *Venezian Lamp* court. In *Hippensteel* v. *County of Fresno* (1917) 4 I.A.C. 304, for example, the claimant was a patient in a county hospital when the hospital staff decided that it needed a porter. The hospital decided to try the claimant out for the job, without pay, and agreed that if he could handle the work it would discharge him as a patient and hire him as a porter. During the tryout period, a cake of ice fell on the claimant and fractured three fingers. The commission concluded that "although the applicant was not yet definitely employed for wages but was only being tested to see whether he could perform the duties of the position, nevertheless he was an employee while thus tentatively engaged." (4 I.A.C. at p. 304.)

Similarly, in *Beatty* v. *San Diego Electric Railway Co.* (1918) 5 I.A.C. 241 (cited with approval in *Union Lumber Co.* v. *Industrial Acc. Com.*

---

[8]In *Sumner* v. *Edmunds* (1933) 130 Cal.App. 770, 777-778 [21 P.2d 159], plaintiff brought a negligence suit against the owner of the newspaper delivery car in which he was riding as a passenger at the time of the accident. The plaintiff had offered his services as a newspaper deliveryman to the defendant, and although the employer did not accept the offer, he did suggest that the plaintiff might want to ride with one of the deliverymen to learn the route in the event an opening should arise in the future. The accident occurred on the delivery route and the *employer* defended the negligence action on the grounds that plaintiff was actually his employee and thus had only a workmen's compensation recovery. The court rejected the employer's contention, declaring that it could not find that an employment relationship had been established as a matter of law. The *Sumner* decision did not involve a "tryout" situation, and, additionally, is distinguishable from the instant matter, because the injury in that case did not occur while the applicant was under the control of the employer. Moreover, the *Sumner* decision may also reflect the marked tendency, noted by Larson in his treatise, of many courts to be more exacting in requiring proof of an employment relationship when the relationship is urged by the employer as a defense to a common law action, than when the issue arises in a workmen's compensation action. (1a Larson, Workmen's Compensation Law (1967) § 47.42(a), p. 777; cf. *Parks* v. *Weaver* (1963) 20 App.Div.2d 588 [245 N.Y.S.2d 221]; *Smith* v. *Adler's Millinery, Inc.* (1939) 122 N.J.L. 236 [4 A.2d 782]; *Fineberg* v. *Public Service Ry. Co.* (1919) 94 N.J.L. 55 [108 A. 311].)

Insofar as the *Sumner* opinion contains broad language indicating that an "employment" relationship, for workmen's compensation purposes, can never exist before a formal contractual "acceptance" of an employee's offer of service, however, the opinion is inconsistent with our present decision and must be disapproved.

(1936) 12 Cal.App.2d 588, 596 [55 Cal.Rptr. 911]), an applicant for a motorman's position was permitted to recover for injuries sustained during a two-day uncompensated tryout period. And in *Gwartney* v. *Western Aviation Co.* (1920) 7 I.A.C. 5, a pilot who had arranged to begin employment with a passenger airline as soon as he had become competent in flying his prospective employer's plane, obtained recovery for injuries sustained during a pre-employment practice flight even though at the time of the injury he was receiving no compensation and, indeed, had not yet resigned from another job.

In *Gwartney* the commission reasoned that since the claimant "was at the time of the injury acting at the instance and inducement of the defendant and in pursuance of the arrangement for employment, although without pay while qualifying for actual service, he was an employee of the defendant and his injury was compensible." (7 I.A.C. at pp. 5-6.) (See also *Bennewitz* v. *Buchanan Olds, Inc.* (1943) 8 Cal. Comp. Cases 190 (claimant injured while making "rounds" with other employee but prior to beginning work); *Oldknow* v. *Western Union Telegraph Co.* (1943) 8 Cal. Comp. Cases 20 (same); *Wise* v. *Pacific Electric Ry. Co.* (1942) 8 Cal. Comp. Cases 17 (claimant injured at pre-employment medical examination); *Meyer* v. *Atchison, T. & S. F. Ry. Co.* (1941) 6 Cal. Comp. Cases 308 (same); *Rabin* v. *Metzger* (1934) 20 I.A.C. 20 (dancer injured at uncompensated rehearsal); cf. *Seale* v. *Columbia Pictures Corp.* (1941) 6 Cal. Comp. Cases 306 (dancer injured at tryout for part in movie, but was receiving ¼ day's pay for the demonstration.) Although a few compensation decisions, without citation of authority, reach a contrary conclusion (see *Housman* v. *Industrial Accident Com.* (1950) 15 Cal. Comp. Cases 242; cf. *Simpson* v. *County of Los Angeles* (1945) 10 Cal. Comp. Cases 106 (alternative ground)), the bulk of the administrative decisions, heeding the legislative directive for a liberal statutory interpretation favoring the protection of the worker, have permitted recovery for injuries incurred in a "tryout" situation.

In the instant matter the Workmen's Compensation Appeals Board, although recognizing both the *Venezian Lamp* decision and the numerous compensation precedents cited above, concluded that the present case was properly distinguishable from the prior authorities. ■ The board reasoned that whereas the "tryouts" in the earlier cases had all required the applicants to undertake the tasks of the actual positions for which they were applying, in the instant case Laeng did not undertake any actual "work" but simply participated in a physical agility test; in the board's view, while the claimants in the prior cases had actually performed a "service" for their prospective employers, Laeng's activities conferred no comparable

"benefit" on the respondent city. Following this reasoning, the board indicated that if Laeng's tryout had involved the actual collection of refuse, instead of an agility test, he would have been entitled to compensation. For the reasons set out below, however, we cannot agree that the mere format of the tryout, selected by the employer, can have the significance which the board has attempted to place on it.

First, the board's decision rests on an overly restricted view of the type of "benefit" or "service" which must accrue to an employer in order to bring the compensation provisions into play (see Lab. Code, § 3357). Although many of the prior "tryout" decisions did arise under circumstances in which the applicant had actually commenced "on-the-job work," this factor is not present in all the cases. In *Gwartney* v. *Western Aviation Co.* (1920) 7 I.A.C. 5, for example, the pilot-claimant suffered injury while simply undertaking a practice flight; he carried no passengers and thus, under the board's terminology, performed no "service" for his potential employer. Nevertheless, the commission permitted a workmen's compensation recovery, recognizing that the applicant's activities did in fact "benefit" the defendant employer. (Cf. *Rabin* v. *Metzger* (1934) 20 I.A.C. 20 (dancer, injured during uncompensated rehearsal, was rendering service to employer).)

In like manner, we must agree with the court in *Smith* v. *Venezian Lamp Co.* (1957) 5 App.Div.2d 12, 14 [168 N.Y.S.2d 764, 766] that a tryout which requires the performance of special skills, relevant to the potential employment, "is for the benefit of the employer, as well as the applicant,"[9] since the applicant's efforts permit the employer to select workers who are likely to be better suited for the available position. In this sense, an agility test, for example, serves the same purpose as an on-the-job trial performance; since the employer is free to select whatever type of tryout he prefers, his choice of an agility test may well indicate that, on the whole, such a

---

[9] In *Dept. of Water & Power* v. *Workmen's Comp. App. Bd.* (1967) 252 Cal.App. 2d 744, 745 [60 Cal.Rptr. 829], the Court of Appeal similarly observed that a "tryout" competition—in that case a physical agility test closely resembling that of the instant case—"was for the joint benefit of the employer and the employee." In the *Dept. of Water & Power* case, an employee of the department—a meter reader— took a physical agility test for the position of "cable splicer helper," a position unrelated to his "meter reading" job. The applicant participated in the test on his day off and without pay, and he admitted that no one at work had advised or encouraged him to take the test, which was open to *all* applicants, not only to city employees. The applicant sustained an injury during the physical agility test and the Court of Appeal upheld an award of compensation, finding that the accident had occurred in the course of the claimant's employment. The court, however, specifically left open the question of whether a similar injury to a "non-employee" would be compensable (252 Cal.App.2d at p. 748); that question, of course, is essentially the issue presented by the instant case.

tryout will be of more "benefit" to him than any alternative test. (Cf. *Smith* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 814, 820 [73 Cal.Rptr. 253, 447 P.2d 365].)

Moreover, an applicant at a "tryout" is also in the "service" of an employer in another sense, for during the tryout the applicant subjects himself to the employer's control, and the employer, in turn, assumes responsibility for directing the applicant's activities. In many respects, the control exercised by the employer in this context parallels the degree of control that is frequently identified as the hallmark of the employment relationship (see, e.g., *Industrial Ind. Exch.* v. *Ind. Acc. Com.* (1945) 26 Cal.2d 130, 135 [156 P.2d 926]; *Brown* v. *Ind. Acc. Com.* (1917) 174 Cal. 457, 460 [163 P. 664]; *Murray* v. *Industrial Acc. Com.* (1932) 216 Cal. 340, 346 [14 P.2d 301]). Certainly when the employer uses this control or authority to direct an applicant to undertake an arduous or potentially hazardous tryout task, as was the case in the instant matter, the situation exhibits the coalescence of both the "service" of the applicant and the "benefit" to the employer.

Second, in attempting to distinguish the instant case from the earlier precedent, the board has overlooked the fact that one fundamental purpose of our comprehensive workmen's compensation scheme is to provide protection against any special risk of employment. "In the evolution of workmen's compensation legislation and case law there has been an increasing recognition of its purpose to distribute the risk of service-connected injuries . . . by charging all enterprises with [these] costs. . . ." (*Van Horn* v. *Industrial Acc. Com.* (1963) 219 Cal.App.2d 457, 467 [33 Cal.Rptr. 169]; see, e.g., *Greydanus* v. *Industrial Acc. Com.* (1965) 63 Cal.2d 490, 492 [47 Cal.Rptr. 384, 407 P.2d 296].) ■ As we noted at the outset, the definition of "employee" in a workmen's compensation context must properly be determined in light of the purposes of the legislation, and, given the act's purpose of protecting individuals from any special risks inherent in employment, the act's coverage may at times properly precede the actual formation of an employment contract when these special risks are present at an earlier stage.

■ As Larson observes in his treatise on Workmen's Compensation, "Since workmen's compensation law is primarily interested in the question when the risks of the employment begin to operate, it is appropriate, quite apart from a strict contract situation, to hold that an injury during a try-out period is covered, when that injury flows directly from employment activities or conditions." (1 Larson, Workmen's Compensation Law (1968) § 26.20, p. 452.16; see *id.* at p. 452.14 (the proper test is whether "the claimant has achieved sufficient connection with the employment to bring him within the orbit of the risks of that employment"); Comment, *The*

*Employment Relation in Workmen's Compensation and Employer's Liability Legislation* (1962) 10 U.C.L.A. L.Rev. 161, 182.)

In the instant case, Laeng incurred his injury while undertaking a "special risk" of employment, as embodied in the timed obstacle course test. Although a refuse collector may not normally be required to run over elevated logs, the city's personnel director testified that the agility test given Laeng was designed to correlate with the skills, and, therefore, the risks, that would be involved in the ultimate employment position. This testimony is hardly surprising since the value of any specialized "tryout" test generally lies in its ability to reproduce, or highlight, actual working conditions. Given these circumstances of the injury, the purposes underlying our workmen's compensation legislation support the granting of compensation. In view of the uncontradicted facts we hold the injury compensible as a matter of law. (*Reinert* v. *Industrial Acc. Com.* (1956) 46 Cal.2d 349, 358 [294 P.2d 713].)

We conclude that the injury incurred by applicant in the performance of the arduous and potentially hazardous tasks prescribed by the employer occurred in the service of the employer. The Labor Code describes the rendition of such service as a crucial criterion of liability under the act. Thus Labor Code section 3351 in part defines employee as "every person in the *service* of an employer under an appointment" (italics added), and section 3357 presumes "any person rendering *service* for another (italics added) to be an employee. Such service here was incurred for the benefit of the employer; it was performed according to his assignment and under his direction and control.

The program for the tryout thus structured a relationship between applicant and employer, which, although not necessarily resultant in permanent employment, was inchoate and viable. Pursuant to it applicant undertook special risks in performing designated, dangerous tasks; at this preliminary stage these were essentially "risks of employment" for which our compensation laws, mandating liberal interpretation in favor of awarding compensation, compel coverage.

The decision of the Workmen's Compensation Appeals Board is annulled and the case is remanded to that board for further proceedings consistent with the views expressed herein.

Wright, C. J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the decision of the Workmen's Compensation Appeals Board.