[Civ. No. 48081. Second Dist., Div. Three. June 29, 1976.]

STATE COMPENSATION INSURANCE FUND, Petitioner, v. WORKERS' COMPENSATION APPEALS BOARD and NORMA JO BATE, Respondents.

Counsel

T. Groezinger, James J. Vonk, George S. Bjornsen and Robert A. La Porta for Petitioner.

Louis I. Bell and Sydney Halem for Respondents.

Opinion

**ALLPORT, J.**—Petitioner, the compensation insurer, contends that respondent Norma Jo Bate, the applicant in the underlying compensation proceeding, was not an employee at the time of her injury.

The compensation judge characterized her as a "substitute" employee and held her injury compensable by analogy to *Laeng* v. *Workmen's Comp. Appeals Bd.,* 6 Cal.3d 771 [100 Cal.Rptr. 377, 494 P.2d 1]. The appeals board concurred without further comment.

The evidence as to respondent's employment status consisted entirely of her testimony and a report of earnings supplied by the alleged employer, Antelope Valley Newspapers, Inc. We have issued a writ of review and examined the entire record, including a transcript of respondent's testimony. We find therein no substantial evidence of an employment relationship or quasi-employment status subsisting at the time of injury. Accordingly, we annul the award and remand the case for further proceedings.

*The Evidence*

Respondent was a tape punch operator and a member of the typographical union. The alleged employer operated as Antelope Valley Press in Palmdale, California. It is apparent that there was a relationship by way of a labor contract between the union and the newspaper, but neither the contract nor any direct information about the employer-union relationship were offered as evidence in this compensation case. Such of the arrangement as can be inferred merely filtered through respondent's testimony as to her individual experience. We therefore recite the testimony in some detail.

She had first worked for the newspaper on January 30, 1975. Except that she had done so through the union, the way in which she first came to work there is not related. It is clear, however, that she never became a "regular" employee. Her "hiring," as she described it, was day-to-day at the rate of $45 per day.

To get a particular day's work, she considered it essential that she report to the secretary of her union, on the newspaper premises, before 8 a.m. On June 9, 1975, she reported, but no one was hired. As she was walking out of the building and down a ramp, she slipped and fell, injuring her back and knee. The award contested in these review proceedings is of continuing temporary disability benefits and certain medical expenses.

As established by the earnings report, the work available to respondent had declined since January 30, 1975, and was virtually eliminated

before June 1975. In the month of February she worked about four days each week, and in March and April about three days. In May she worked a total of four days, the last day worked having been May 21, 1975. She had not worked from that date until her injury on June 9.

As to the reason for the decline in work, the employer reported that "she was claiming posted union overtime," adding "which any union member in the U.S. can do." The report also stated that there would have been no further earnings because there was "no overtime to claim" and "there was no work for her to claim." Respondent testified only that "they cut down on the hiring," that there had been "a decrease at the office," and that she was "only working one or two days a week."

Respondent could not recall the last date before June 9 that she had gone to the premises "to look for work," but she thought that "Wednesday and Friday and Saturday are the best days to show up to get hired." Accordingly, she "came in" twice or three times each week. However, she considered herself under no obligation to appear. "If I don't want to work, I don't show up," but "If you want to work, you have to show up." Also, "if you don't show up, it is not a mark against you." The "employer doesn't have any requirement that you show up. . . that is up to you. If you want to get paid you do, but you have to make an attempt to stay in the union."

There were other "substitute workers" who did the same kind of work as respondent. They, too, reported to the union secretary, who was "a fellow employee," but "not part of management." The foreman could not hire anyone, but related any need for workers to the union secretary, and "the secretary determines who has the most priority and who has the job for the day." For any particular union member to be hired "you have to be there at 8. That is show-up time." Otherwise someone else would be hired.

To be considered available for employment, the union required that the member attempt to obtain work at least once each week. That was necessary "to stay on the available board" and "to retain your membership card." Members thus available, but not employed, were not required to pay union dues. A member's "showing-up" satisfied those union requirements, but otherwise had "nothing to do with the company policy."

It appears that on June 9, the date respondent was injured, three persons in various crafts "showed up," but no one was hired because there was no work. Counsel argued, "on that day she is an applicant for work. The only way she is going to get hired is to show up. . . . Every time she ever got hired, she did the same thing. . . . She is an applicant for work when she enters those premises." The compensation judge responded rhetorically, "Everybody that comes looking for work is an applicant for work, but does that make them an employee?"

*Discussion*

■ For an injury to arise "out of and in the course of employment" (Cal. Const., art. XX, § 21; Lab. Code, § 3600), there obviously must be a subsisting employment. "It is frequently stated that for an injury to occur in the course of employment the employee must be engaged in the work he has been hired to perform or some expectable personal act incidental thereto and the injury must occur within the period of his employment and at a place where he may reasonably be for that purpose." (*Dept. of Water & Power* v. *Workmen's Comp. App. Bd. (Antrobus)*, 252 Cal.App.2d 744, 746 [60 Cal.Rptr. 829].)

Employment, in turn, depends upon an underlying agreement between the parties. Labor Code section 3351 defines "employee" for purposes of workers' compensation to mean "every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written." Thus, "[i]t appears manifest under statutory and case law that a contractual relationship must exist between the parties before a claimant is entitled to benefits." (*Anaheim General Hospital* v. *Workmen's Comp. App. Bd. (Craig)*, 3 Cal.App.3d 468, 474 [83 Cal.Rptr. 495].) Similarly, "[i]n any case, the relationship of employer and employee under a contract of employment is essential to recovery of compensation." (*McBurney* v. *Industrial Acc. Com.*, 220 Cal. 124, 126 [30 P.2d 414]; see also, 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed.) §§ 3.01, 3.02, 3.04, 4.04; 1A Larson, Workmen's Compensation Law, §§ 47.00, 47.10.)

■ "A contract of employment is governed by the same rules applicable to other types of contracts, including the requirements of offer and acceptance." (*Reynolds Elec. etc. Co.* v. *Workmen's Comp. App. Bd. (Egan)*, 65 Cal.2d 429, 433 [55 Cal.Rptr. 248, 421 P.2d 96]; see also

*Reynolds Elec. etc. Co.* v. *Workmen's Comp. App. Bd. (Buckner),* 65 Cal.2d 438, 441 [55 Cal.Rptr. 254, 421 P.2d 102].) As the *Egan* and *Buckner* decisions illustrate, either the prospective employer or employee can be the "offeror" and the other the "offeree." Also, the offer can be transmitted through a labor union, but in that event the union merely "act[s] as the employer's agent for some purposes." (65 Cal.2d at p. 435.) ■ Acceptance of the offer need not be attended by formality and, as in *Egan* and *Buckner,* may be by conduct alone, but it must be such as to result in "an implied contract of employment", "the existence and terms of which [are] manifested by the conduct of the respective parties." (*Anaheim General Hospital* v. *Workmen's Comp. App. Bd. (Craig), supra,* 3 Cal.App.3d 468, 475.) As Professor Larson explains (*supra,* § 47.10), as a matter of fairness to the parties, including the employee, a bilateral and mutual relationship must be attained:

"Compensation law, however, is a mutual arrangement between the employer and employee under which both give up and gain certain things. Since the rights to be adjusted are reciprocal rights between employer and employee, it is not only logical but mandatory to resort to the agreement between them to discover their relationship. To thrust upon a worker an employee status to which he has never consented would not ordinarily harm him in a vicarious liability suit by a stranger against his employer, but it might well deprive him of valuable rights under the compensation act, notably the right to sue his own employer for common-law damages."·

■ Applying these accepted principles to the case at bench, it seems clear that respondent was not an employee at the time of her injury. While she had worked previously and, depending upon circumstances including her willingness, might have worked again, both she and the employer understood and accepted the day-to-day character of the "posted overtime" work she obtained. Their "contract" and her "employment" extended no further. Any continuity to the employment arose out of her status in the union and union rules, rather than out of any relationship or agreement with the newspaper. Although this record contains no direct evidence on the subject, it appears that the actual arrangement was a "union shop," with a "hiring hall" as to the extra work, the only difference from the usual union hiring hall pattern being that the union activities took place on the employment premises. The "show-up" was a union requirement, rather than an incident of any continuing intermittent employment, and the member reported to union representatives rather than to management. Any "contract of hire" (Lab.

Code, § 3351) resulting from that arrangement would presuppose a call for workers by the employer or at least an announcement of the availability of work. (See the *Egan* and *Buckner* decisions, *supra.*) ■ Also, in a somewhat different vein, an injury to a union member while on the premises for union activities or purposes, and not as an incident to employment, is not deemed to arise out of employment. (*Pacific Ind. Co.* v. *Industrial A. Com.,* 27 Cal.App.2d 499, 502, 503 [81 P.2d 572].)

■ Almost as a matter of definition, a job applicant or seeker of employment is not an employee. As declared in early decisions, ". . . until such application is made and the party accepted, the relation of employer and employee is not established" (*Highway Com.* v. *Industrial Acc. Com.,* 40 Cal.App. 465, 467-468 [181 P. 112]) and "A mere offer of services not yet accepted by the prospective employer is not sufficient. . . ." (*Sumner* v. *Edmunds,* 130 Cal.App. 770, 778 [21 P.2d 159]; see the comment upon *Sumner* v. *Edmunds* in *Laeng* v. *Workmen's Comp. Appeals Bd., supra,* 6 Cal.3d 771, 779, fn. 8.). In these situations, it makes no difference that the injury is of a kind that would be covered by workers' compensation if there were an employment. There is no employment and the question is not one of "arising out" of employment or "course" of employment.

■ However, there are a few situations in which employment or an adequate employment-like relationship is deemed to exist before formal hiring or technical contractual "acceptance" by the prospective employer. (See 1 Larson, Workmen's Compensation Law, § 26.20.) One of those is the "tryout" for employment, held to be within workers' compensation coverage in the *Laeng* decision, *supra.* The "tryout" involves a potential employee offering his services and a prospective employer offering presumably available employment. Only selection or acceptance of the employee remains. While it bends contractual conceptions somewhat to treat the "tryout" prospect as an employee, he is rendering "service" and bestowing "benefit" upon the employer, both of a kind afforded by an employee. He is also accepting the direction and control of the employer, and the risks to him are the same as those of employment. ■ As held in *Laeng,* policy considerations require that his efforts be covered by workers' compensation..

These considerations do not apply to a person merely calling at employment premises to inquire as to the availability of employment,

even though if there were work, hiring would be a virtual certainty. The potential employer is not offering employment and is not considering tenders of services. He exerts no control and the risks to the caller are the same as those to any business visitor.

■ In sum, extension of the policy considerations and expanded contractual analysis of *Laeng* to respondent at the time of her injury on June 9, 1975, was not warranted. The board was in error in doing so.

■ Petitioner also asserts that respondent's "average weekly earnings" were erroneously estimated for purposes of temporary disability benefits, the benefits being two-thirds of earnings. (Lab. Code, § 4653.) In the award, respondent's entire 16 weeks of work experience with this employer were averaged to produce average weekly earnings of $149 or more than three days per week at the daily rate of $45. All of the evidence was to the effect that respondent's foreseeable work expectancy had dwindled to no more than one or two days per week. Average earnings are "in effect, a prediction of what the employee's earnings would have been had he not been injured." (*Raymond Plastering* v. *Workmen's Comp. App. Bd.,* 252 Cal.App.2d 748, 751-752 [60 Cal.Rptr. 860].)

The award is annulled and the case is remanded to the board for proceedings consistent with this opinion.

Cobey, Acting P. J., and Potter, J., concurred.