558 S.E.2d 635

**Robert I. DODSON, Plaintiff Below, Appellant**

v.

**WORKERS' COMPENSATION DIVISION and Brown & Root, Defendants Below, Appellees.**

No. 29264.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 3, 2001.

Decided Nov. 8, 2001.

Dissenting Opinion of Justice Maynard Dec. 11, 2001.

Concurring Opinion of Justice Starcher Dec. 13, 2001.

Don M. Stacy, Reginald D. Henry, Law Office of Don M. Stacy, Beckley, for Appellant.

Sandra L. Evans, Charleston, for Appellee, Workers' Compensation Division.

Barney Frazier, Kay, Casto & Chaney, Charleston, for Appellee, Brown & Root.

ALBRIGHT, Justice.

In this appeal from the decision of the Workers' Compensation Appeal Board (hereinafter "WCAB") certified on May 31, 2000, the claimant below, Robert I. Dodson (hereinafter "Appellant"), argues that his claim for benefits was improperly denied. The WCAB's decision reversed the ruling of the Office of Judges dated September 13, 1999, which concurred with the Workers' Compensation Division decision of October 16, 1998, finding that Appellant sustained a compensable back injury while employed by Brown & Root, Inc. (hereinafter "B & R").[1] Appellant contends that the WCAB erred in finding

---

1. No brief was submitted by the Workers' Compensation Division even though it is named as an appellee in this case.

that the administrative law judge was clearly wrong in concluding that Appellant sustained a back injury in the course and as a result of his employment. For the reasons stated below, we reverse the WCAB order.

## I. Factual and Procedural Background

Appellant's claim for workers' compensation benefits, dated August 25, 1998, stated that he had pain in his lower back with throbbing and numbness in his legs as a result of an injury he sustained on July 31, 1998, "when doing [a] physical test for pre-employment" at the offices of B & R. The application also related that Appellant stopped working on August 14, 1998, due to the injury. B & R protested the application for benefits primarily on the ground that Appellant was not an employee at the time of the purported injury because he was not on B & R's payroll until August 3, 1998.

Events leading up to the alleged injury are revealed in the record. During a deposition on March 29, 1999, Appellant explained that some time during the month of July in 1998, he contacted B & R and asked a human resources personnel assistant, Ms. Mary Kays, about job openings for electricians. Appellant maintains that Ms. Kays asked him to report to B & R's personnel office on July 31, 1998, and advised him he had to complete a safety orientation program[2] before that date. Because he had worked for B & R before,[3] Appellant said he knew that the purpose of the July 31, 1998, appointment was to fill out the necessary paperwork, as well as to complete a drug screening test, safety comprehension test and a physical agility test.[4]

2. The required safety orientation was an eight-hour class which was not conducted by B & R and for which Appellant had to personally pay $50 to attend.

3. Appellant had worked for B & R on three previous occasions.

4. A written explanation of the agility test's purpose was made part of the record in a document entitled "Brown & Root Companies Physical Agility Test Record and Release," which stated that the test is conducted "in order to assess [ ] physical agility to perform the reasonable and necessary duties required of a[n] elec[trician]." The document further explained that the person

Appellant's low back injury allegedly occurred on July 31, 1998, while performing the agility test which Ms. Kays administered. Appellant testified that one component of the agility test required a person to bend forward and pull on a bar suspended on a chain. He explained that he hurt his back the first time he tried to pull on the bar because the bar was below his knees which placed his back at a "steep angle" when he pulled on it. According to Appellant, he asked Ms. Kays to reposition the bar after the first attempt, but she encouraged him to try two more times before she acceded to his request. Appellant maintained that after the adjustment his back was in a more straightened position, which enabled him to complete the pull successfully. Appellant admitted that he did not tell Ms. Kays during or after the agility test that he experienced back pain.

Ms. Kays' testimony during a June 1, 1999, telephone deposition challenged Appellant's explanation of what transpired during the agility test. She said that she made the bar adjustment before Appellant even attempted the lift. She also confirmed that Appellant did not express, by words or behavior, that he had been injured during the test.

Immediately following the testing with Ms. Kays, Appellant was sent to Dr. Arvind Viradia, whose specialty is internal medicine, for a complete physical examination. During Dr. Viradia's testimony it was established that he had performed physical examinations for B & R for eight years. The reports and testimony of the doctor indicated that he saw no evidence of a back injury during the course of the physical examination,[5] nor had Appellant told the doctor that he had injured his back during the agility test. In his re-

taking the test would "be required to exert significant physical effort ..." and that it would "place significant stress on [the] back, joints and muscle [sic]." The last declaration on the form states that "[t]he physical agility test must be successfully completed without actual or alleged injury."

5. The record discloses that Dr. Viradia visually checked the flexion, extension and rotation of Appellant's cervical, thoracic and lumbar spine and examined the neurological reflexes of Appellant's extremities as part of the employment physical.

port to B & R dated July 31, 1998, Dr. Viradia checked the box on the form which stated that Appellant was qualified to "be assigned to any work consistent with skills and training; examination revealed no immediately significant medical problems."

After completing the physical, Appellant returned to Ms. Kays' office on July 31, 1998, and Ms. Kays told him to report to work August 3, 1998. A memo dated August 26, 1998, authored by Ms. Kays to Mike King, B & R's health safety environmental coordinator, stated "Mr. Dodson was hired on July 31, 1998, as an electrician, reporting to UCC–South Charleston on August 3, 1998." Appellant was placed on B & R's payroll on August 3, 1998, and he spent the remainder of the week in an orientation class which was attended by one other trainee, Steve Collias.

Appellant testified that during that week in August, 1998, his low back felt uncomfortable sitting through the orientation, and he remarked about the discomfort to Mr. Collias. Mr. Collias filed a written statement with B & R dated August 24, 1998, saying that during the orientation classes Appellant had mentioned to him that "when he did his strength test in the Dunbar office he had hurt his back while doing one of the tests." Mr. Collias reiterated this information during a deposition held on June 1, 1999. The orientation instructor, Jimmy Johnston, was also deposed on June 1, 1999, and he testified that Appellant never told him that he injured his back and that Appellant exhibited no back problems while in the class.

The week following the orientation, August 10 through August 14, Appellant was sent by B & R to work on electrical jobs in the field. Appellant testified that on August 12 and 13, he and a coworker were assigned to a job which involved driving ten-foot-long rods into the ground with a jackhammer which weighed approximately ninety pounds. Appellant operated the jackhammer during the two-day period because he was not certified to operate the bucket lift which was needed to raise the person operating the jackhammer to a height above the rods. Additionally, Appellant lifted and carried the jackhammer about 150 feet between the bucket lift and the tool room where the jackhammers were stored. Appellant testified that lifting the jackhammer caused increased back pain, but he continued to finish out the work week which ended on Friday, August 14, 1998. Appellant testified that while driving home on that Friday, he felt a sharp pain in his groin area, and when he got out of bed the next morning he had throbbing pain at the top of his legs with a burning sensation going down the inside of his legs. On Sunday, August 16, Appellant's brother was killed in a car accident, and B & R granted Appellant's request to take the week off from work. Appellant said that the pain in his back and legs worsened during the week he was off.

It was not until he returned to work on August 24, 1998, that Appellant first reported his injury of July 31, 1998, to B & R's safety office by filing a written statement regarding the incident. While conceding that he did not comply with B & R's policy to report any on-the-job injury immediately, Appellant explained in his testimony that he did not think that the soreness and pain in his back was something that would last and said,

> I didn't want to complain because, basically, from what I've seen from Brown & Root in my past experience from working with them, it seems like to me guys that complain are the guys that go down the road first, and I'm just trying to keep a job with them basically at that time.

Appellant also testified that he had not previously injured his back in any way. The B & R Medical Questionnaire which Appellant completed before he participated in the agility test likewise indicated that he had no prior injury to his back.

After he filed the August 24, 1998, written injury statement, Appellant was taken by B & R's health safety environmental coordinator to see Dr. Viradia. Dr. Viradia testified that he found no restrictions in Appellant's range of motion, but during palpitation of the lower back he detected tenderness and muscle spasm. He diagnosed Appellant with acute lumbar sprain, supplied Appellant with muscle relaxers and anti-inflammatory medication and ordered a modified work schedule for two weeks.

Appellant went to see Dr. Vincent E. Wardlow, a chiropractor, on August 25, 1998, the same day that Appellant completed his workers' compensation claim form. Dr. Wardlow diagnosed Appellant's condition as lumbosacral sprain, sacroiliac sprain and lumbosacral neuritis. The attending physician's portion of the claim form was completed by Dr. Wardlow, who indicated that Appellant's low back injury was the result of completing a pre-employment strength test and that the disability suffered by Appellant was the direct result of this injury.

On October 16, 1998, the Workers' Compensation Division (hereinafter "the Division") held Appellant's claim compensable and awarded temporary total disability benefits from August 25, 1998, through October 1, 1998. At the request of the Division, Appellant was examined by Dr. A.E. Landis, an orthopaedic surgeon. Dr. Landis submitted a report dated December 1, 1998, wherein he related his impression that Appellant sustained a strain/sprain type injury to the lower back in a work-related incident. His report also referenced an October 23, 1998, MRI of Appellant's lumbar spine, which showed minimal left of midline disc bulging at L4–5.

The Division ordered the closing of Appellant's claim on a temporary total disability basis on June 28, 1999. Based on the recommendation of Dr. Landis, the Division subsequently granted Appellant a five percent permanent partial disability award by order dated August 6, 1999. Timely protests were filed by both parties.

On September 13, 1999, the Office of Judges affirmed the Division's October 16, 1998, ruling which held Appellant's claim compensable. B & R appealed the September 13 ruling to the WCAB, which determined that Appellant's claim was not compensable. In support of its conclusion that

the decision of the administrative law judge was clearly wrong,[6] the May 31, 2000, WCAB order set forth two specific findings: (1) Appellant was not an employee at the time he participated in a pre-employment agility test when the claimed injury occurred; and (2) even if Appellant was an employee at the time, he had not met the burden of proving his injury occurred on that date while completing the test. As a result of these findings, the WCAB reversed the ruling of the Office of Judges, rejected the claim and deemed all payments in the claim as overpayments subject to recovery. It is from the May 31, 2000, WCAB final order that this appeal is taken.

## II. Standard of Review

■ We apply a de novo standard of review to questions of law arising in the context of WCAB decisions. *Conley v. Workers' Compensation Div.*, 199 W.Va. 196, 199, 483 S.E.2d 542, 545 (1997). Furthermore, when the legal conclusions contained in a final order of the WCAB are found to be erroneous, this Court will reverse on appeal. Syl. Pt. 4, *Emmel v. State Compensation Director*, 150 W.Va. 277, 145 S.E.2d 29 (1965).

■ With regard to findings of fact of the WCAB, we stated in the syllabus of *Hosey v. Workmen's Compensation Comm'r*, 151 W.Va. 172, 151 S.E.2d 729 (1966), "This Court will not reverse a finding of fact made by the Workmen's Compensation Appeal Board unless it appears from the proof upon which the appeal board acted that the finding is plainly wrong."

## III. Discussion

Appellant argues that the WCAB erred in reversing the Offices of Judges decision on the grounds that: Appellant was not an employee of B & R on July 31, 1998, when the injury occurred; and even if Appellant was

---

6. WCAB is required, pursuant to West Virginia Code § 23–5–12 (1995) (Repl.Vol.1998), to reverse, vacate or modify an order of an administrative law judge when it determines that the judges's findings are:

    (1) In violation of statutory provisions; or

    (2) In excess of the statutory authority or jurisdiction of the administrative law judge; or

    (3) Made upon unlawful procedures; or

    (4) Affected by other error of law; or

    (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or

    (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W.Va.Code § 23–5–12(b).

an employee of B & R on that date, the evidence did not support the conclusion that Appellant was injured on the job.

■ We first consider whether Appellant, as a job applicant who was allegedly injured while performing a physical agility test required by a prospective employer, is covered by the Workers' Compensation Act (hereinafter "the Act").[7] To be entitled to benefits under the Act, a person must come within the terms of the statutory definition "employee," which states:

> Employees subject to this chapter are all persons in the service of employers and employed by them for the purpose of carrying on the industry, business, service or work in which they are engaged.

W.Va.Code § 23–2–1a(a)(1999) [2001 Supplement], in part. We are mindful that this Court also has established that "[a] contract of employment for remuneration is necessary to constitute the relation of employer and employee under the [Workers'] Compensation Act." Syllabus, *Basham v. County Court of Kanawha County,* 114 W.Va. 376, 171 S.E. 893 (1933).[8] Consequently, to determine whether Appellant was an employee when the injury occurred, we must consider whether he was in the service of the employer for the purpose of carrying on the employer's industry, business, service or work while serving under a contract for remuneration. We note further that in regard to making determinations of whether or not an employment relationship exists, this Court has said that "the most important element is the right or power of direction and control of the manner in which the work is to be performed." Syl. Pt. 5, in part, *Davis v. Fire Creek Fuel Co.,* 144 W.Va. 537, 109 S.E.2d 144 (1959), *overruled on other grounds by Yates v. Mancari,* 153 W.Va. 350, 168 S.E.2d 746 (1969).

The specific issue of whether an injury sustained during a preliminary employment test is compensable under the Act as a job-related mishap is one of first impression for this Court. Our examination of the jurisdictions which have addressed the issue reveals two lines of thinking.

Jurisdictions which have determined that such an injury is not compensable have found that an applicant's participation in a pre-employment test did not create an employment contract between the applicant and the prospective employer as required by the law in the jurisdiction. In *Boyd v. City of Montgomery,* 515 So.2d 6 (Ala.Civ.App.1987), the court held that "[a]lthough [the claimant] exposed herself to risk in trying out for employment with the City, she did so willingly and consciously. The benefit the City received from Boyd's taking an agility test does not rise to the level where a contract of employment can be imputed." *Id.* at 7. The court in *Sellers v. City of Abbeville,* 458 So.2d 592 (La.App.1984), similarly concluded that when a claimant participated in an agility test, he "was taking the test for his own benefit so that he would be eligible for employment .... There was no employer-employee relationship." *Id.* at 594. After finding that no contractual relationship existed between an applicant injured during a pre-employment agility test and the employer requiring the test, the Oregon Court of Appeals in *Dykes v. State Accident Insurance Fund,* 47 Or.App. 187, 613 P.2d 1106 (1980), observed that finding the existence of a contract in such situations would compel the untenable conclusion that "every person who makes application to an employer for a job, fills out an application and takes any kind of test is *ipso facto* an employe[e]." *Id.* at 1107. The Supreme Court of Colorado in *Younger v. City and County of Denver,* 810 P.2d 647 (Colo.1991) found no employment contract was created by an applicant participating in preemployment testing when the successful completion of the tests merely qualified a pool of candidates from which final selections would be made. "At no time during the application process was [claimant] promised employment as a police officer, even if she passed all the requisite tests." *Id.* at 653.

---

7. W.Va.Code Chapter 23.

8. The statutory provisions relied on by the Court in *Basham,* West Virginia Code §§ 23–2–1 and

23–2–5 (1931), are incorporated in the current statutory provisions of West Virginia Code §§ 23–2–1a and 23–2–5 respectively.

Jurisdictions which find injuries sustained during requisite preemployment tests compensable initially establish that the statutory and decisional law of the jurisdiction do not mandate the existence of an employment contract to establish an employment relationship covered by workers' compensation. These jurisdictions then rely on the service aspect of the employer-employee relationship under the workers' compensation laws to conclude that preemployment tests requiring the performance of special skills which benefit the employer as well as the applicant qualify for workers' compensation coverage. In *Lotspeich v. Chance Vought Aircraft*, 369 S.W.2d 705 (Tex.Civ.App.1963), the appellate court examined a case claiming the employer was negligent because the plaintiff contracted tuberculosis during a preemployment physical. The *Lotspeich* court found "the physical examination was conducted on the employer's premises, not for the benefit of the applicant, but wholly for the benefit of the employer and under its direction and control. Therefore, it is clear that appellant was an employee" whose right to pursue a negligence claim was "extinguished by the Workmen's Compensation Law." *Id.* at 709. In a New York case, *Smith v. Venezian Lamp Co.*, 5 A.D.2d 12, 168 N.Y.S.2d 764 (N.Y.App.Div.1957), a workers' compensation claimant who was injured while being tested for a job as a lamp polisher was found by the court to be an employee whose claim was compensable even though wages and hours were never discussed with the applicant, nor was he paid for any work. The *Venezian Lamp* court concluded

"that where a tryout involves an operation that would be ordinarily viewed as hazardous under the Workmen's Compensation Law a special employment exists.... A tryout is for the benefit of the employer, as well as the applicant, and if it involves a hazardous job we see no valid reason why the applicant should not be entitled to the protection of the [workers' compensation] statute."

*Id.* at 766. In *Laeng v. Workmen's Compensation Appeals Board*, 6 Cal.3d 771, 100 Cal.

Rptr. 377, 494 P.2d 1 (1972), the claimant was injured while completing a physical agility test conducted by his prospective employer which was designed to reflect the actual conditions of the job of a refuse crew worker. The Supreme Court of California held:

[T]he injury incurred by [the] applicant in the performance of the arduous and potentially hazardous tasks prescribed by the employer occurred in the service of the employer .... Such service here was incurred for the benefit of the employer; it was performed according to his assignment and under his direction and control.

*Id.* at 9.

Although we find the two approaches taken by other jurisdictions instructive, neither completely embraces the situation before us in the instant case or the law of this state. As previously noted, our law requires that, for a person to be considered an employee for workers' compensation purposes, a contract of employment must exist.

The factual bases for the WCAB's conclusion that Appellant was not an employee of B & R during the agility test when the alleged injury occurred is explained in the following manner in its May 31, 2000, order: "The claimant was not hired by Brown & Root until he had completed the hiring process on July 31, 1998. The hiring process included a physical agility test. Further, the claimant was not on the payroll at Brown & Root until August 3, 1998." Based on our review of the record, we do not find that the facts of this case support the WCAB's legal conclusion.[9]

The WCAB conclusion about when the employment relationship was established ignores relevant testimony of Appellant and Ms. Kays. In responding to the questioning of counsel for B & R regarding when he was hired, Appellant said:

A: Actually, they told me that they were going to hire me two days before that and that I had to go take another class on a Thursday before that Friday, that I had to pay $50, and eight hours of my time was involved in that class, and then

---

**9.** Findings of facts supporting the legal conclusions of the WCAB are subject to review by the courts. *Emmel v. State Compensation Director*, 150 W.Va. 277, 284, 145 S.E.2d 29, 34 (1965).

the following day I came back to Brown & Root and did their test.

Q: When were you actually hired as far as you understand, two days before July 31?

A: Yes, verbally I was hired.

Q: So that would be July 29?

A: But I did not get paid until the following Monday. Usually—I thought I was going to get paid on that Friday for the testing that Ms. Keys [sic] gave me and whenever I very first worked with them they did pay me for that time and now they've stopped paying for that time.

Q: Who was it that verbally hired you?

A: Mary Keys [sic].

. . . .

Q: Now, what exactly did Mary say to you that leads you to say here today you were verbally hired?

A: She told me that I was going to have to go take that class before hiring . . . . She said that I would have to take that class first, pay the $50, and then come back in to see her and I would be hired.

In response to questioning by B & R's counsel regarding Appellant's hiring process, Ms. Kays testified:

A: Well, first we get labor requisitions from the job site needing certain type of people. My job then is to make contact with this person by phone.

At the time that I called Mr. Dodson, he was not interested in the job, he said he was working at the time, but he later called me and told me if the job was still available, that he would like the position, which I called the supervisor, the electrical superintendent out at the job site, and he said he still needed people, and he okayed me to hire him.

So I called and talked to Robert and told him that he could come in at such and such date, which happened to be July 31st, and I would do his processing and get him ready to go to work on August 3rd.

. . . .

Q: Did Mr. Dodson have to complete all of those items you just mentioned on July 31st, 1998 before an offer of employment was made?

A: Yes, sir. He has to complete all— make sure the physical is intact, pass the physical agility and the safety comprehension. Everything has to be done and satisfied here in this office before he's able to go to the job site.

The testimony establishes that Ms. Kays was authorized to make, and did make, an offer of employment to Appellant on the condition that he successfully complete a series of tests. Appellant's acceptance of the offer was evidenced by him attending and personally paying for a safety class and subsequently completing the battery of preemployment tests at B & R's office, including an agility test. Appellant's participation in those tests, and particularly the strength and agility test which posed a risk of immediate and significant injury to Appellant, constituted an acceptance of the offer and created a contract of employment, notwithstanding the absence of remuneration to Appellant for participating in the agility test. The agility test was administered under the direction and control of B & R. It simulated conditions involving the exposure to risk of immediate and significant physical harm, to which an electrician might be exposed in the B & R workplace. The test benefitted and assisted B & R in carrying on its business by defining and testing a minimum level of strength and agility which B & R considered essential to the performance of the duties by such electricians. Therefore, we find that Appellant comes within the definition of employee in West Virginia Code § 23–2–1a(a), for the purposes of worker's compensation.

■ Accordingly, we hold that where an offer of employment is conditioned upon an applicant successfully completing a course of safety instruction at his own expense and thereafter submitting to a physical agility test—administered under the direction and control of the employer for the benefit of the employee and the employer—involving exposure of the applicant to the risk of immediate and significant physical harm, participation in the physical agility test constitutes an

acceptance of the employment, entitling the applicant to workers' compensation coverage for any injury sustained in the course of the physical agility test notwithstanding the absence of remuneration paid to the employee for participation in the test. To the extent that our holding in the Syllabus of *Basham v. County Court of Kanawha County*, 114 W.Va. 376, 171 S.E. 893 (1933), requires remuneration as a prerequisite for workers' compensation coverage for such an injury, it is hereby modified.[10] We emphasize that our conclusion reached today is narrowly drawn and driven by the facts of this case. Participation in a preemployment test does not, standing alone, create an employment contract for workers' compensation purposes.

We now examine the second reason why the WCAB reversed the administrative law judge's order: "[E]ven if the claimant was considered to be an employee of Brown & Root on July 31, 1998, he has not met his burden of proving that an injury occurred on July 31, 1998, while he was completing the [agility] test."

■ In order to be compensable under the Act, an injury must be proven to be incurred during the course of and as a result of employment. W.Va.Code § 23–4–1 (1989) (Repl. Vol 1998). To prove a compensable claim, a claimant must produce evidence which demonstrates the coexistence of: "(1) a personal injury (2) received in the course of employment and (3) resulting from that employment." Syl. Pt. 1, in part, *Barnett v. State Workmen's Compensation Comm'r*, 153 W.Va. 796, 172 S.E.2d 698 (1970). The level of proof a claimant must produce to prove a claim compensable is evidence, however slight, that would lead a reasonable person to conclude that the claimant was injured while performing his duties in the course of his employment or duties incidental to that employment. *Machala v. State Compensation Comm'r*, 109 W.Va. 413, 155 S.E. 169 (1930); *Ramey v. State Compensation Comm'r*, 150 W.Va. 402, 146 S.E.2d 579 (1966). However, while "[a] claimant in a workmen's compensa-

tion case must bear the burden of proving his claim [ ] in doing so it is not necessary to prove to the exclusion of all else the causal connection between the injury and the employment." Syl. Pt. 2, in part, *Sowder v. State Workmen's Compensation Comm'r*, 155 W.Va. 889, 189 S.E.2d 674 (1972). Moreover, we have consistently stated that the Act requires that evidence in a workers' compensation claim must be liberally construed in favor of the claimant. *See, e.g., Myers v. State Workmen's Compensation Comm'r*, 160 W.Va. 766, 770, 239 S.E.2d 124, 126, (1977); Syl. Pt. 1, *Johnson v. State Workmen's Compensation Comm'r*, 155 W.Va. 624, 186 S.E.2d 771 (1972); Syllabus, *Fulk v. State Compensation Comm'r*, 112 W.Va. 555, 166 S.E. 5 (1932). We conduct our review of the evidence based on these well-established tenets.

■ B & R contends that the WCAB correctly overturned the ruling of the administrative law judge because Appellant did not prove the causal connection between his complaints and a work-related event, noting that all of the medical, testimonial and other evidence presented by Appellant could only be characterized as "totally subjective, biased, self-serving statements."

Our review of the record shows that Appellant indicated on a medical questionnaire completed on July 31, 1998, before he participated in the physical agility test in question, that he had no previous back injuries or conditions. He restated this information when he was deposed. Appellant's testimony established that he injured his low back while completing lifts in the course of an agility test he took on July 31, 1998. The record includes an August 24, 1998, written statement filed with B & R by an employee who attended a week long orientation with Appellant the week after the alleged injury occurred. The fellow employee's written statement and his later testimony related that Appellant informed him the week after the agility test was taken that Appellant was

---

**10.** The conclusion we reach today is narrowly drawn. It addresses immediate and significant risks of injury which might occur in the workplace, with or without the fault of any person, for which an employee would have little or no re-

course under traditional common law remedies and defenses despite having rendered a meaningful service to an employer at substantial personal risk. We do not address preemployment tests directed primarily at verifying basic aptitudes.

uncomfortable sitting through an orientation class because he had injured his back while completing the agility test. The rebuttal evidence offered by B & R was the testimony of Ms. Kays, Mr. King and Mr. Johnston, all of which stated that the claimant never mentioned the low back injury, pain or condition on July 31, 1998.

Appellant's medical evidence included the diagnosis by Dr. Wardlow of lumbosacral sprain, sacroiliac sprain and lumbosacral neuritis, which the doctor concluded were the result of completing a pre-employment strength test. Appellant also relied on the examination completed by Dr. Landis, the Divisions's examining orthopaedic surgeon. In his written report in the record, Dr. Landis related that the onset of Appellant's lower back injury symptoms coincided with the lifting requirements of the July 31, 1998, agility test and that the symptoms increased when Appellant operated and carried a jackhammer while working for B & R as an electrician. Dr. Landis' report concluded that Appellant sustained a sprain/strain type of injury to his lower back in a work-related incident.

The only medical evidence supplied by B & R was information from two examinations completed by B & R's physician, Dr. Viradia. Dr. Viradia examined Appellant on July 31, 1998, before the injury was reported, for a routine physical required by the employer. Dr. Viradia found nothing unusual during the course of the physical and reported to B & R that Appellant could "be assigned to any work consistent with his skills and training." On the day Appellant reported the injury, August 24, 1998, Dr. Viradia reexamined Appellant and, based on Appellant's complaint, he detected tenderness and muscle spasm in Appellant's lower back and diagnosed acute lumbar sprain.

We find no evidence in the record which indicates that Appellant's lower back condition was caused by any event other than the work-related incidents of the agility test lifts, which we have heretofore concluded to be an employment activity, and the later use of a jackhammer to complete an assigned job after Appellant was on B & R's payroll. However, we observe with particular concern that the evidence of injury or aggravation of injury associated with Appellant's use of a jackhammer, at a time when Appellant clearly was a B & R employee, was either overlooked or disregarded without explanation in WCAB's order.

Consequently, based on all of the evidence presented, we find that a reasonable person could conclude that Appellant was injured while performing duties in the course of and as a result of employment, and the administrative law judge's ruling of September 13, 1999, finding the same and holding the claim compensable, was not clearly wrong. Therefore, we find that the WCAB erred in its finding that there was insufficient evidence to support the Office of Judges compensability decision.

For the reasons herein stated, we find that the May 31, 2000, WCAB order contains erroneous legal conclusions regarding both the employment status of Appellant when he participated in the agility test and the sufficiency of evidence. Accordingly, we reverse the May 31, 2000, WCAB order, and thereby reinstate the provisions of the September 13, 1999, order of the Office of Judges.

Reversed.

Justice MAYNARD dissents and files dissenting opinion joined by Justice DAVIS.

Justice STARCHER concurs and files a concurring opinion.

MAYNARD, Justice, dissenting.

(Filed Dec. 11, 2001)

I dissent because I believe the WCAB's finding that no contract of employment existed between the claimant and B & R on July 31, 1998 is not "plainly wrong." The majority opinion states that the critical question which must be resolved is whether a claimant "was in the service of the employer for the purpose of carrying on the employer's industry, business, service or work while serving under a contract for remuneration." The opinion then disregards this analysis and finds that a contract of employment existed between the claimant and B & R on July 31, 1998 because he agreed to take a safety class and undergo pre-employment testing.

The record clearly shows that B & R did not hire the claimant prior to completing the testing and neither was B & R paying him at that time. In fact, whether the claimant would be hired or not was contingent on the results of the testing. Moreover, not only was the claimant not on the company's payroll, but the claimant himself paid $50 to participate in the pre-employment exercises. I have not met too many people, if any, who would go to work pursuant to an "employment contract" and not only work for free, but actually expend money from their own pockets and then consider themselves to be employees. If I am spending my money to search for a job, I do not believe that I am an employee of any company. Nonetheless, the majority somehow finds that B & R benefitted from the testing, so the claimant was an "employee ... for the purposes of worker's compensation." If a person is not an employee for any other reason, I do not believe that person is an employee for purposes of worker's compensation.

Several courts in other jurisdictions have addressed the precise issue presented to this Court and have denied workers' compensation benefits. In *Rastaetter v. Charles S. Wilson Memorial Hosp.,* 80 A.D.2d 608, 436 N.Y.S.2d 47, 47 (N.Y.App.Div.1981), the court addressed the question of "whether an individual who is required to undergo a pre-employment physical examination should be considered an employee, within the meaning of the Workers' Compensation Law, with respect to injuries arising out of the pre-employment physical examination." The court in *Rastaetter* held that such an individual was not an employee for workers' compensation purposes. *Id. See also Cluff v. Nana–Marriott,* 892 P.2d 164, 171 (Alaska 1995) ("The circumstances surrounding the stress test are not sufficient to give rise to an implied employment contract. Even if [claimant] consented to act under [defendant's] control for the period of the test, neither party treated the test as an employment relationship [for workers' compensation purposes.]"); *Cust–O–Fab v. Bohon,* 876 P.2d 736, 738 (Okl.App.1994) ("[W]e decline to extend [workers' compensation] coverage to claimants who sustain injury during the course of pre-employment skills testing[.]"); *Younger*

*v. City and County of Denver,* 810 P.2d 647, 653 (Colo.1991) ("[W]e find that there was no mutual agreement between the [defendant] and [claimant] sufficient to create an employer-employee relationship that would justify an award of workers' compensation benefits."); *BBC Brown Boveri v. Lusk,* 108 Or. App. 623, 816 P.2d 1183, 1185 (1991) ("[C]laimant's only contact with [defendant] was ... when he performed a welding test for a position as a boiler maker and participated in an orientation 'school.' Claimant failed the test and was not hired at that time.... It follows that he was not a 'worker' and that [defendant] could not have been an employer [for workers' compensation purposes.]"); *Esters v. General Motors Corp.,* 200 Cal.App.3d 1278, 246 Cal.Rptr. 566, 570 (Cal.App. 2 Dist.1988) ("We conclude that appellant did not enter into an employment relationship by submitting to a pre-employment physical.").

The majority opinion purports to cite to three cases from other jurisdictions which hold that "injuries sustained during requisite pre-employment tests [are] compensable[.]" None of the cases cited stand for such a proposition. In the first case cited by the majority opinion, *Lotspeich v. Chance Vought Aircraft,* 369 S.W.2d 705 (Tex.Civ.App.1963), the plaintiff sued the employer for failing to inform her that the pre-employment examination revealed that she had tuberculosis. The trial court granted summary judgment to the employer on the basis that any duty owed by the employer to inform the plaintiff of the disease was a matter covered by workers' compensation. On appeal the "plaintiff" argued that workers' compensation law did not apply and that she should be allowed to sue the employer. The appellate court disagreed on the grounds that the plaintiff was hired on the day she took the physical examination, and that the test results from the physical examination did not come back until several weeks later, while she was an employee.

In the instant proceeding, the majority opinion took nondispositive dicta from *Lotspeich* to make it appear as though the plaintiff in that case had sustained a pre-employment injury and was seeking workers' compensa-

tion benefits. The truth is, the plaintiff did not want workers' compensation benefits— she wanted to sue the employer. It was the employer who argued successfully that workers' compensation law applied because they hired the plaintiff on the day of the examination and they learned of her disease several weeks after she was employed.

The other two cases cited by the majority opinion are equally contrary to the majority opinion. In both cases cited by the majority opinion, *Smith v. Venezian Lamp Co.*, 5 A.D.2d 12, 168 N.Y.S.2d 764 (N.Y.App.Div. 1957) and *Laeng v. Workmen's Comp. Appeals Bd.*, 6 Cal.3d 771, 100 Cal.Rptr. 377, 494 P.2d 1 (1972), the claimants were "trying out" for employment. *Smith* and *Laeng* both held that "tryout" work is sufficient to permit workers' compensation laws to be invoked because the claimants were engaged in activities that were the same as that which they would do if employed by the employers.

I am fundamentally dismayed by the majority opinion's distorted reliance on *Smith* and *Laeng* for two reasons. First, courts around the country have recognized that "tryout" work is not the same as engaging in a pre-employment physical examination. The reason courts around the country make such a distinction and apply different rules is because the overwhelming majority of employers in the country require routine medical proof of the basic healthiness of potential employees. Consequently, it would pose an undue economic burden to require employers to pay additional workers' compensation premiums to cover pre-employment physical examination injuries. On the other hand, the overwhelming majority of employers in the country do not require "tryout" work by potential employees. The distinct line of cases that follow *Smith* and *Laeng* seek to protect employers from "civil lawsuits" when potential employees suffer injury during "tryout" work by invoking workers compensation laws that preclude such civil lawsuits.

The second reason for my dismay with the majority opinion's reliance on *Smith* and *Laeng*, is that the majority opinion has disingenuously sought to apply those cases to the instant set of facts, when the state appellate courts which decided *Smith* and *Laeng* have refused to extend those cases to facts similar to the instant case. As to the *Smith* decision, New York appellate courts have refused to apply that decision to injuries resulting from pre-employment physical examinations. *See Rastaetter, supra.* As to the *Laeng* case, California appellate courts have refused to apply that decision to pre-employment physical examination injuries. *See Esters, supra.*

Finally, I believe the claimant did not prove by credible evidence that he suffered an injury on July 31, 1998. The majority opinion declares that the claimant's testimony "established" that he injured his back during the agility testing. "Establish" means "to put beyond doubt: prove." Webster's Collegiate Dictionary 397 (10th ed.1993). The evidence conclusively shows that the claimant did not report an injury to the human resources personnel assistant at the time he allegedly hurt his back; neither did he report an injury to anybody else at the company; neither did he report an injury to Dr. Viradia when he was examined on the very day he was allegedly injured; and Dr. Viradia found no injury during the examination.

Almost a month passed before evidence surfaced that the claimant allegedly suffered a back injury during the pre-employment testing. The claimant filed a claim for benefits on August 25, 1998. Dr. Wardlow concluded the claimant injured his back as a result of pre-employment strength testing. How would the doctor know? The claimant told him. Similarly, Dr. Landis concluded the claimant injured his back with an onset date of July 31, 1998. How would the doctor know? The claimant told him. I agree with the WCAB that this evidence is "totally subjective, biased, [and] self-serving[.]" This "proves" only that the claimant told the doctors he suffered a back injury on July 31, 1998 and that he exhibited symptoms on the day he was examined. On August 24, 1998, Dr. Viradia again examined the claimant and found tenderness and muscle spasm in the claimant's lower back. A reasonable person would find this "proves" the claimant suffered a back injury at some time between July 31, 1998 and August 24, 1998.

The majority admits this is the first time the West Virginia's Worker's Compensation system has faced this problem. Potential employers had better be alerted that it is almost assuredly not the last time. I believe this injury is a health insurance problem, not a worker's compensation problem. Worker's compensation was not intended to be an insurance program or a retirement program. For the foregoing reasons, I would affirm the WCAB's decision.

Accordingly, I respectfully dissent. I am authorized to state that Justice DAVIS joins me in this dissent.

## STARCHER, Justice, concurring.
### (Filed Dec. 13, 2001)

Our workers' compensation law is designed to provide limited benefits to any claimant who has "received personal injuries *in the course of* and *resulting from* their covered employment[.]" *W.Va.Code*, 23–4–1 [1989] (emphasis added). The workers compensation act does require that the claimant be an "employee"—but loosely defines an employee as a person "in the service of [an] employer[ ] and employed [1] by them for the purpose of carrying on the industry, business, service or work in which [the employer is] engaged." *W.Va.Code*, 23–2–1a(a) [1999].

To figure out if a claimant was injured "in the course of" employment, you must look at the time, place and manner of his injury: was he in the workplace during work hours doing work-related activities? To figure out if a claimant's injury "resulted from" employment, you must consider whether the claimant was being exposed to a work-related risk, so it can reasonably be said that the injury arose out of the job.

When a candidate for a job goes to a place at the behest of a prospective employer, and is told by the employer to perform a pre-employment test or engage in some physical feat, the candidate is being tested to see if he or she can do the job. Occasionally, while performing these tests for the employer the candidate is injured. Reason dictates that such injuries are compensable as a work-related injury under *W.Va.Code*, 23–4–1.

First, the injury is in the course of employment because the candidate is at a place chosen by the employer, during a time chosen by the employer, doing a task designated by the employer.

Second, the injury results or arises from the employment because the candidate is being exposed to risks comparable to risks that would occur in the workplace. "[T]he value of any specialized 'tryout' test generally lies in its ability to reproduce, or highlight, actual working conditions." *Laeng v. Workmen's Compensation Appeals Board*, 6 Cal.3d 771, 100 Cal.Rptr. 377, 494 P.2d 1, 8–9 (1972). If you are exposing a candidate for a job to actual or reproduced working conditions, he is being exposed to risks of the employment for the employer's benefit.

Third, the candidate is acting "in the service" of the employer—the tests being completed in a "tryout" are designed to ensure the candidate is capable of meeting the employer's service needs. Generally, the tests being completed are actual or reproduced working conditions—and are thereby designed to further the employer's "purpose of carrying on the industry, business, service or work in which" the employer is engaged.

In the instant case, Mr. Dodson appeared at the Brown & Root office, at the time chosen by Brown & Root, and was ordered to perform manual tasks designed to simulate the rigors of employment. Mr. Dodson would be asked to lift heavy items on a Brown & Root jobsite where he could strain his back — and, not surprisingly, Brown & Root exposed Mr. Dodson to the same risk of injury at the Brown & Root office, where he was asked to lift a heavy item (a bar suspended on a chain below his knees). A job with Brown & Root required physical exertion — accordingly, its physical agility test

---

1. As the majority opinion recognizes in Syllabus Point 3, remuneration is not a necessary requirement for a claimant to be considered as "employed" by an employer. The dictionary definition of "employ" bolsters this conclusion. "Employ" can mean "use to good effect," "hire, engage, enlist, recruit, enroll, sign (up), take on, ... keep, retain ... utilize, apply," and so on. Payment in cash in return for services rendered is not an absolute requirement of the statute, nor should it be.

was designed to see if Mr. Dodson was physically capable of acting in the service of Brown & Root, and whether he could be employed for the purposes of carrying the "industry, business, service or work" of Brown & Root. Under this fact pattern alone, I believe that Mr. Dodson's injuries were compensable.

The majority opinion strains the record to find an offer and acceptance of contractual terms to support its opinion that an employer–employee relationship existed between the claimant and Brown & Root. I believe this was unnecessary.

Professor Larson, in his treatise on workers' compensation law, plainly states that when a candidate is injured while going through a pre–employment physical examination or test, the injury should be compensable. He states:

> Since workers' compensation law is primarily interested in the question {of} when the risks of the employment begin to operate, it is appropriate, quite apart from the strict contract situation, to hold that an injury during a try–out period is covered, when that injury flows directly from employment activities or conditions. ... It is also appropriate to treat a pre-employment physical examination as part of the employment[.]

2 *Larson's Workers' Compensation Law* § 26.02[6] ("Entering Premises Before Formal Hiring: Try-out Periods and Physical Examinations Before Hiring").

I believe that, in the future, when a claimant is injured while engaging in a "try-out" for a job, the Division should look to *W.Va. Code*, 23–4–1 to consider whether the claimant was acting "in the course of" an assignment by the employer, and whether the claimant's injury "resulted from" some risk comparable to what would be faced on the job. If so, the claimant was likely furthering the interests of the employer's business—and accordingly, his injury is work-related and compensable.

My dissenting colleagues make light of the fact that the claimant was not on the company payroll, and that Brown & Root required the claimant to pay to complete the pre-employment process. The record certainly shows that Brown & Root went to great lengths to distance itself from job applicants, and made it clear that an applicant had to successfully complete the pre-employment process before being hired. But the fact remains, Brown & Root exposed the claimant to work-related hazards for a work-related purpose—and to the extent the claimant was injured in the course of and as a result of these work-related hazards, he should be compensated under the workers' compensation scheme.[2]

Contrary to the assertions made by the dissenters, the majority's opinion does not convert the workers' compensation system into a health insurance plan for prospective job candidates. Instead, the system provides limited benefits only for injuries to candidates that occur in the course of and result from the pre-employment tests required by the employer. Injuries which are outside this scheme—such as from a trip and fall in the employer's parking lot while leaving the pre-employment test—would still fall within the ambit of the tort system.

The majority's opinion should, however, suggest to the Legislature that some confusion still exists over the extent to which candidates for employment are considered "employees" under *W.Va.Code*, 23–2–1a(a) when those candidates are injured in the course of a pre-employment tryout or physical examination. Accordingly, Legislative action may be necessary to clarify this situation.

I therefore respectfully concur.

---

2. And, of course, when a candidate is injured in the course of and resulting from a job-related "tryout," the employer should receive the immunity from suit provided by the Workers' Compensation Act. *W.Va.Code*, 23–4–6 [1991].